(Slip Opinion) OCTOBER TERM, 2018 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WEYERHAEUSER CO. *v.* UNITED STATES FISH AND WILDLIFE SERVICE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 17–71. Argued October 1, 2018—Decided November 27, 2018

The Fish and Wildlife Service administers the Endangered Species Act of 1973 on behalf of the Secretary of the Interior. In 2001, the Service listed the dusky gopher frog as an endangered species. See 16 U. S. C. §1533(a)(1). That required the Service to designate "critical habitat" for the frog. The Service proposed designating as part of that critical habitat a site in St. Tammany Parish, Louisiana, which the Service dubbed "Unit 1." The frog had once lived in Unit 1, but the land had long been used as a commercial timber plantation, and no frogs had been spotted there for decades. The Service concluded that Unit 1 met the statutory definition of unoccupied critical habitat because its rare, high-quality breeding ponds and distance from existing frog populations made it essential for the species' conservation. §1532(5)(A)(ii). The Service then commissioned a report on the probable economic impact of its proposed critical-habitat designation. §1533(b)(2). With regard to Unit 1, the report found that designation might bar future development of the site, depriving the owners of up to $33.9 million. The Service nonetheless concluded that the potential costs were not disproportionate to the conservation benefits and proceeded to designate Unit 1 as critical habitat for the dusky gopher frog.

Unit 1 is owned by petitioner Weyerhaeuser and a group of family landowners. The owners of Unit 1 sued, contending that the closed-canopy timber plantation on Unit 1 could not be critical habitat for the dusky gopher frog, which lives in open-canopy forests. The District Court upheld the designation. The landowners also challenged the Service's decision not to exclude Unit 1 from the frog's critical habitat, arguing that the Service had failed to adequately weigh the

2          WEYERHAEUSER CO. *v.* UNITED STATES FISH AND
                         WILDLIFE SERV.

                              Syllabus

benefits of designating Unit 1 against the economic impact, had used an unreasonable methodology for estimating economic impact, and had failed to consider several categories of costs. The District Court approved the Service's methodology and declined to consider the challenge to the Service's decision not to exclude Unit 1. The Fifth Circuit affirmed, rejecting the suggestion that the "critical habitat" definition contains any habitability requirement and concluding that the Service's decision not to exclude Unit 1 was committed to agency discretion by law and was therefore unreviewable.

*Held*:

1. An area is eligible for designation as critical habitat under §1533(a)(3)(A)(i) only if it is habitat for the species. That provision, the sole source of authority for critical-habit designations, states that when the Secretary lists a species as endangered he must also "designate any habitat of such species which is then considered to be critical habitat." It does not authorize the Secretary to designate the area as critical habitat unless it is also habitat for the species. The definition allows the Secretary to identify a subset of habitat that is critical, but leaves the larger category of habitat undefined. The Service does not now dispute that critical habitat must be habitat, but argues that habitat can include areas that, like Unit 1, would require some degree of modification to support a sustainable population of a given species. Weyerhaeuser urges that habitat cannot include areas where the species could not currently survive. The Service, in turn, disputes the premise that the administrative record shows that the frog could not survive in Unit 1. The Court of Appeals, which had no occasion to interpret the term "habitat" in §1533(a)(3)(A)(i) or to assess the Service's administrative findings regarding Unit 1, should address these questions in the first instance. Pp. 8–10.

2. The Secretary's decision not to exclude an area from critical habitat under §1533(b)(2) is subject to judicial review. The Administrative Procedure Act creates a "basic presumption of judicial review" of agency action. *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140. The Service contends that the presumption is rebutted here because the action is "committed to agency discretion by law," 5 U. S. C. §701(a)(2), because §1533(b)(2) is one of those rare provisions "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Lincoln* v. *Vigil*, 508 U. S. 182, 191.

Section 1533(b)(2) describes a unified process for weighing the impact of designating an area as critical habitat. The provision's first sentence requires the Secretary to "tak[e] into consideration" economic and other impacts before designation, and the second sentence authorizes the Secretary to act on his consideration by providing that he

Syllabus

"may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of" designation. The word "may" certainly confers discretion on the Secretary, but it does not segregate his discretionary decision not to exclude from the mandated procedure to consider the economic and other impacts of designation when making his exclusion decisions. The statute is, therefore, not "drawn so that a court would have no meaningful standard against which to judge the [Secretary's] exercise of [his] discretion" not to exclude. *Lincoln*, 508 U. S., at 191. Weyerhaeuser's claim—that the agency did not appropriately consider all the relevant statutory factors meant to guide the agency in the exercise of its discretion—is the sort of claim that federal courts routinely assess when determining whether to set aside an agency decision as an abuse of discretion. The Court of Appeals should consider in the first instance the question whether the Service's assessment of the costs and benefits of designation and resulting decision not to exclude Unit 1 was arbitrary, capricious, or an abuse of discretion. Pp. 10–15.

827 F. 3d 452, vacated and remanded.

ROBERTS, C. J., delivered the opinion of the Court, in which all other Members joined, except KAVANAUGH, J., who took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–71

WEYERHAEUSER COMPANY, PETITIONER *v.*
UNITED STATES FISH AND WILDLIFE
SERVICE, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[November 27, 2018]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The Endangered Species Act directs the Secretary of the Interior, upon listing a species as endangered, to also designate the "critical habitat" of the species. A group of landowners whose property was designated as critical habitat for an endangered frog challenged the designation. The landowners urge that their land cannot be *critical* habitat because it is not *habitat*, which they contend refers only to areas where the frog could currently survive. The court below ruled that the Act imposed no such limitation on the scope of critical habitat.

The Act also authorizes the Secretary to exclude an area that would otherwise be included as critical habitat, if the benefits of exclusion outweigh the benefits of designation. The landowners challenged the decision of the Secretary not to exclude their property, but the court below held that the Secretary's action was not subject to judicial review.

We granted certiorari to review both rulings.

2      WEYERHAEUSER CO. *v.* UNITED STATES FISH AND
WILDLIFE SERV.

Opinion of the Court

I

A

The amphibian *Rana sevosa* is popularly known as the "dusky gopher frog"—"dusky" because of its dark coloring and "gopher" because it lives underground. The dusky gopher frog is about three inches long, with a large head, plump body, and short legs. Warts dot its back, and dark spots cover its entire body. Final Rule To List the Mississippi Gopher Frog Distinct Population Segment of Dusky Gopher Frog as Endangered, 66 Fed. Reg. 62993 (2001) (Final Listing). It is noted for covering its eyes with its front legs when it feels threatened, peeking out periodically until danger passes. *Markle Interests, LLC* v. *United States Fish and Wildlife Serv.*, 827 F. 3d 452, 458, n. 2 (CA5 2016). Less endearingly, it also secretes a bitter, milky substance to deter would-be diners. Brief for Intervenor-Respondents 6, n. 1.

The frog spends most of its time in burrows and stump holes located in upland longleaf pine forests. In such forests, frequent fires help maintain an open canopy, which in turn allows vegetation to grow on the forest floor. The vegetation supports the small insects that the frog eats and provides a place for the frog's eggs to attach when it breeds. The frog breeds in "ephemeral" ponds that are dry for part of the year. Such ponds are safe for tadpoles because predatory fish cannot live in them. Designation of Critical Habitat for Dusky Gopher Frog, 77 Fed. Reg. 35129–35131 (2012) (Designation).

The dusky gopher frog once lived throughout coastal Alabama, Louisiana, and Mississippi, in the longleaf pine forests that used to cover the southeast. But more than 98% of those forests have been removed to make way for urban development, agriculture, and timber plantations. The timber plantations consist of fast-growing loblolly pines planted as close together as possible, resulting in a closed-canopy forest inhospitable to the frog. The near

eradication of the frog's habitat sent the species into severe decline. By 2001, the known wild population of the dusky gopher frog had dwindled to a group of 100 at a single pond in southern Mississippi. That year, the Fish and Wildlife Service, which administers the Endangered Species Act of 1973 on behalf of the Secretary of the Interior, listed the dusky gopher frog as an endangered species. Final Listing 62993–62995; see 87 Stat. 886, 16 U. S. C. §1533(a)(1).

B

When the Secretary lists a species as endangered, he must also designate the critical habitat of that species. §1533(a)(3)(A)(i). The ESA defines "critical habitat" as:

> "(i) the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and
> 
> "(ii) specific areas outside the geographical area occupied by the species . . . upon a determination by the Secretary that such areas are essential for the conservation of the species." §1532(5)(A).

Before the Secretary may designate an area as critical habitat, the ESA requires him to "tak[e] into consideration the economic impact" and other relevant impacts of the designation. §1533(b)(2). The statute goes on to authorize him to "exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of [designation]," unless exclusion would result in extinction of the species. *Ibid.*

A critical-habitat designation does not directly limit the rights of private landowners. It instead places conditions on the Federal Government's authority to effect any physical changes to the designated area, whether through

4    WEYERHAEUSER CO. *v.* UNITED STATES FISH AND
WILDLIFE SERV.

Opinion of the Court

activities of its own or by facilitating private development. Section 7 of the ESA requires all federal agencies to consult with the Secretary to "[e]nsure that any action authorized, funded, or carried out by such agency" is not likely to adversely affect a listed species' critical habitat. 16 U. S. C. §1536(a)(2). If the Secretary determines that an agency action, such as issuing a permit, would harm critical habitat, then the agency must terminate the action, implement an alternative proposed by the Secretary, or seek an exemption from the Cabinet-level Endangered Species Committee. See *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644, 652 (2007); 50 CFR 402.15 (2017).

Due to resource constraints, the Service did not designate the frog's critical habitat in 2001, when it listed the frog as endangered. Designation, at 35118–35119. In the following years, the Service discovered two additional naturally occurring populations and established another population through translocation. The first population nonetheless remains the only stable one and by far the largest. Dept. of Interior, U. S. Fish and Wildlife Serv., Dusky Gopher Frog (*Rana sevosa*) Recovery Plan iv, 6–7 (2015).

In 2010, in response to litigation by the Center for Biological Diversity, the Service published a proposed critical-habitat designation. Designation, at 35119. The Service proposed to designate as occupied critical habitat all four areas with existing dusky gopher frog populations. The Service found that each of those areas possessed the three features that the Service considered "essential to the conservation" of the frog and that required special protection: ephemeral ponds; upland open-canopy forest containing the holes and burrows in which the frog could live; and open-canopy forest connecting the two. But the Service also determined that designating only those four sites would not adequately ensure the frog's conservation.

Because the existing dusky gopher frog populations were all located in two adjacent counties on the Gulf Coast of Mississippi, local events such as extreme weather or an outbreak of an infectious disease could jeopardize the entire species. Designation of Critical Habitat for Mississippi Gopher Frog, 75 Fed. Reg. 31394 (2010) (proposed 50 CFR Part 17).

To protect against that risk, the Service proposed to designate as *unoccupied* critical habitat a 1,544-acre site in St. Tammany Parish, Louisiana. The site, dubbed "Unit 1" by the Service, had been home to the last known population of dusky gopher frogs outside of Mississippi. The frog had not been seen in Unit 1 since 1965, and a closed-canopy timber plantation occupied much of the site. But the Service found that the site retained five ephemeral ponds "of remarkable quality," and determined that an open-canopy forest could be restored on the surrounding uplands "with reasonable effort." Although the uplands in Unit 1 lacked the open-canopy forests (and, of course, the frogs) necessary for designation as occupied critical habitat, the Service concluded that the site met the statutory definition of unoccupied critical habitat because its rare, high-quality breeding ponds and its distance from existing frog populations made it essential for the conservation of the species. Designation*,* at 35118, 35124, 35133, 35135.

After issuing its proposal, the Service commissioned a report on the probable economic impact of designating each area, including Unit 1, as critical habitat for the dusky gopher frog. See 16 U. S. C. §1533(b)(2); App. 63. Petitioner Weyerhaeuser Company, a timber company, owns part of Unit 1 and leases the remainder from a group of family landowners. Brief for Petitioner 16. While the critical-habitat designation has no direct effect on the timber operations, St. Tammany Parish is a fast-growing part of the New Orleans metropolitan area, and the land-

6     WEYERHAEUSER CO. *v.* UNITED STATES FISH AND
WILDLIFE SERV.

Opinion of the Court

owners have already invested in plans to more profitably develop the site. App. 80–83. The report recognized that anyone developing the area may need to obtain Clean Water Act permits from the Army Corps of Engineers before filling any wetlands on Unit 1. 33 U. S. C. §1344(a). Because Unit 1 is designated as critical habitat, Section 7 of the ESA would require the Corps to consult with the Service before issuing any permits.

According to the report, that consultation process could result in one of three outcomes. First, it could turn out that the wetlands in Unit 1 are not subject to the Clean Water Act permitting requirements, in which case the landowners could proceed with their plans unimpeded. Second, the Service could ask the Corps not to issue permits to the landowners to fill some of the wetlands on the site, in effect prohibiting development on 60% of Unit 1. The report estimated that this would deprive the owners of $20.4 million in development value. Third, by asking the Corps to deny even more of the permit requests, the Service could bar all development of Unit 1, costing the owners $33.9 million. The Service concluded that those potential costs were not "disproportionate" to the conservation benefits of designation. "Consequently," the Service announced, it would not "exercis[e] [its] discretion to exclude" Unit 1 from the dusky gopher frog's critical habitat. App. 188–190.

## C

Weyerhaeuser and the family landowners sought to vacate the designation in Federal District Court. They contended that Unit 1 could not be critical habitat for the dusky gopher frog because the frog could not survive there: Survival would require replacing the closed-canopy timber plantation encircling the ponds with an open-canopy longleaf pine forest. The District Court nonetheless upheld the designation. *Markle Interests*, *LLC* v.

*United States Fish and Wildlife Serv.*, 40 F. Supp. 3d 744 (ED La. 2014). The court determined that Unit 1 satisfied the statutory definition of unoccupied critical habitat, which requires only that the Service deem the land "essential for the conservation [of] the species." *Id.,* at 760.

Weyerhaeuser also challenged the Service's decision not to exclude Unit 1 from the dusky gopher frog's critical habitat, arguing that the Service had failed to adequately weigh the benefits of designating Unit 1 against the economic impact. In addition, Weyerhaeuser argued that the Service had used an unreasonable methodology for estimating economic impact and, regardless of methodology, had failed to consider several categories of costs. *Id.,* at 759. The court approved the Service's methodology and declined to consider Weyerhaeuser's challenge to the decision not to exclude. See *id.,* at 763–767, and n. 29.

The Fifth Circuit affirmed. 827 F. 3d 452. The Court of Appeals rejected the suggestion that the definition of critical habitat contains any "habitability requirement." *Id.,* at 468. The court also concluded that the Service's decision not to exclude Unit 1 was committed to agency discretion by law and was therefore unreviewable. *Id.,* at 473–475. Judge Owen dissented. She wrote that Unit 1 could not be "essential for the conservation of the species" because it lacked the open-canopy forest that the Service itself had determined was "essential to the conservation" of the frog. *Id.,* at 480–481.

The Fifth Circuit denied rehearing en banc. *Markle Interests, LLC* v. *United States Fish and Wildlife Serv.*, 848 F. 3d 635 (2017). Judge Jones dissented, joined by Judges Jolly, Smith, Clement, Owen, and Elrod. They reasoned that critical habitat must first be habitat, and Unit 1 in its present state could not be habitat for the dusky gopher frog. *Id.,* at 641. The dissenting judges also concluded that the Service's decision not to exclude Unit 1 was reviewable for abuse of discretion. *Id.,* at 654, and

8    WEYERHAEUSER CO. *v.* UNITED STATES FISH AND
WILDLIFE SERV.

Opinion of the Court

n. 21.

We granted certiorari to consider two questions: (1) whether "critical habitat" under the ESA must also be habitat; and (2) whether a federal court may review an agency decision not to exclude a certain area from critical habitat because of the economic impact of such a designation. 583 U. S. ___ (2018).[1]

## II

## A

Our analysis starts with the phrase "critical habitat." According to the ordinary understanding of how adjectives work, "critical habitat" must also be "habitat." Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality. It follows that "critical habitat" is the subset of "habitat" that is "critical" to the conservation of an endangered species.

Of course, "[s]tatutory language cannot be construed in a vacuum," *Sturgeon* v. *Frost*, 577 U. S. ___, ___ (2016) (slip op., at 12) (internal quotation marks omitted), and so we must also consider "critical habitat" in its statutory context. Section 4(a)(3)(A)(i), which the lower courts did not analyze, is the sole source of authority for critical-habitat designations. That provision states that when the Secretary lists a species as endangered he must also "designate any *habitat of such species* which is then considered to be critical habitat." 16 U. S. C. §1533(a)(3)(A)(i) (em-

_____

[1] Intervenor Center for Biological Diversity raises an additional question in its brief, arguing that Weyerhaeuser lacks standing to challenge the critical-habitat designation because it has not suffered an injury in fact. We agree with the lower courts that the decrease in the market value of Weyerhaeuser's land as a result of the designation is a sufficiently concrete injury for Article III purposes. See *Village of Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 386 (1926) (holding that a zoning ordinance that "greatly . . . reduce[d] the value of appellee's lands and destroy[ed] their marketability for industrial, commercial and residential uses" constituted a "present invasion of appellee's property rights").

phasis added). Only the "habitat" of the endangered species is eligible for designation as critical habitat. Even if an area otherwise meets the statutory definition of unoccupied critical habitat because the Secretary finds the area essential for the conservation of the species, Section 4(a)(3)(A)(i) does not authorize the Secretary to designate the area as *critical* habitat unless it is also *habitat* for the species.

The Center for Biological Diversity contends that the statutory definition of critical habitat is complete in itself and does not require any independent inquiry into the meaning of the term "habitat," which the statute leaves undefined. Brief for Intervenor-Respondents 43–49. But the statutory definition of "critical habitat" tells us what makes habitat "critical," not what makes it "habitat." Under the statutory definition, critical habitat comprises areas occupied by the species "on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection," as well as unoccupied areas that the Secretary determines to be "essential for the conservation of the species." 16 U. S. C. §1532(5)(A). That is no baseline definition of habitat—it identifies only certain areas that are indispensable to the conservation of the endangered species. The definition allows the Secretary to identify the subset of habitat that is critical, but leaves the larger category of habitat undefined.

The Service does not now dispute that critical habitat must be habitat, see Brief for Federal Respondents 23, although it made no such concession below. Instead, the Service argues that habitat includes areas that, like Unit 1, would require some degree of modification to support a sustainable population of a given species. *Id.*, at 27. Weyerhaeuser, for its part, urges that habitat cannot include areas where the species could not currently sur-

10      WEYERHAEUSER CO. *v.* UNITED STATES FISH AND
WILDLIFE SERV.

Opinion of the Court

vive. Brief for Petitioner 25. (Habitat can, of course, include areas where the species does not currently *live*, given that the statute defines critical habitat to include unoccupied areas.) The Service in turn disputes Weyerhaeuser's premise that the administrative record shows that the frog could not survive in Unit 1. Brief for Federal Respondents 22, n. 4.

The Court of Appeals concluded that "critical habitat" designations under the statute were not limited to areas that qualified as habitat. See 827 F. 3d, at 468 ("There is no habitability requirement in the text of the ESA or the implementing regulations."). The court therefore had no occasion to interpret the term "habitat" in Section 4(a)(3)(A)(i) or to assess the Service's administrative findings regarding Unit 1. Accordingly, we vacate the judgment below and remand to the Court of Appeals to consider these questions in the first instance.[2]

## B

Weyerhaeuser also contends that, even if Unit 1 could be properly classified as critical habitat for the dusky gopher frog, the Service should have excluded it from designation under Section 4(b)(2) of the ESA. That provision requires the Secretary to "tak[e] into consideration the economic impact . . . of specifying any particular area as critical habitat" and authorizes him to "exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat." 16 U. S. C.

—————

[2] Because we hold that an area is eligible for designation as critical habitat under Section 4(a)(3)(A)(i) only if it is habitat for the species, it is not necessary to consider the landowners' argument that land cannot be "essential for the conservation of the species," and thus cannot satisfy the statutory definition of unoccupied critical habitat, if it is not habitat for the species. See Brief for Petitioner 27–28; Brief for Respondent Markle Interests, LLC, et al. in Support of Petitioner 28–31.

§1533(b)(2). To satisfy its obligation to consider economic impact, the Service commissioned a report estimating the costs of its proposed critical-habitat designation. The Service concluded that the costs of designating the proposed areas, including Unit 1, were not "disproportionate" to the conservation benefits and, "[c]onsequently," declined to make any exclusions.

Weyerhaeuser claims that the Service's conclusion rested on a faulty assessment of the costs and benefits of designation and that the resulting decision not to exclude should be set aside. Specifically, Weyerhaeuser contends that the Service improperly weighed the costs of designating Unit 1 against the benefits of designating *all* proposed critical habitat, rather than the benefits of designating Unit 1 in particular. Weyerhaeuser also argues that the Service did not fully account for the economic impact of designating Unit 1 because it ignored, among other things, the costs of replacing timber trees with longleaf pines, maintaining an open canopy through controlled burning, and the tax revenue that St. Tammany Parish would lose if Unit 1 were never developed. Brief for Petitioner 53–54. The Court of Appeals did not consider Weyerhaeuser's claim because it concluded that a decision not to exclude a certain area from critical habitat is unreviewable.

The Administrative Procedure Act creates a "basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140 (1967) (quoting 5 U. S. C. §702). As we explained recently, "legal lapses and violations occur, and especially so when they have no consequence. That is why this Court has so long applied a strong presumption favoring judicial review of administrative action." *Mach Mining, LLC* v. *EEOC*, 575 U. S. \_\_\_, \_\_\_–\_\_\_ (2015) (slip op., at 7–8). The presumption may be rebutted only if the relevant statute precludes review, 5 U. S. C. §701(a)(1), or if the action is "committed to agency

12    WEYERHAEUSER CO. *v.* UNITED STATES FISH AND
WILDLIFE SERV.

Opinion of the Court

discretion by law," §701(a)(2). The Service contends, and the lower courts agreed, that Section 4(b)(2) of the ESA commits to the Secretary's discretion decisions not to exclude an area from critical habitat.

This Court has noted the "tension" between the prohibition of judicial review for actions "committed to agency discretion" and the command in §706(2)(A) that courts set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Heckler* v. *Chaney*, 470 U. S. 821, 829 (1985). A court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable. To give effect to §706(2)(A) and to honor the presumption of review, we have read the exception in §701(a)(2) quite narrowly, restricting it to "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln* v. *Vigil*, 508 U. S. 182, 191 (1993). The Service contends that Section 4(b)(2) of the ESA is one of those rare statutory provisions.

There is, at the outset, reason to be skeptical of the Service's position. The few cases in which we have applied the §701(a)(2) exception involved agency decisions that courts have traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum appropriation, *Lincoln*, 508 U. S., at 191, or a decision not to reconsider a final action, *ICC* v. *Locomotive Engineers*, 482 U. S. 270, 282 (1987). By contrast, this case involves the sort of routine dispute that federal courts regularly review: An agency issues an order affecting the rights of a private party, and the private party objects that the agency did not properly justify its determination under a standard set forth in the statute.

Section 4(b)(2) states that the Secretary

"shall designate critical habitat . . . after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat.  The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area . . . unless he determines . . . that the failure to designate such area as critical habitat will result in the extinction of the species concerned."  16 U. S. C. §1533(b)(2).

Although the text meanders a bit, we recognized in *Bennett* v. *Spear*, 520 U. S. 154 (1997), that the provision describes a unified process for weighing the impact of designating an area as critical habitat.  The first sentence of Section 4(b)(2) imposes a "categorical requirement" that the Secretary "tak[e] into consideration" economic and other impacts before such a designation.  *Id.,* at 172 (emphasis deleted).  The second sentence authorizes the Secretary to act on his consideration by providing that he may exclude an area from critical habitat if he determines that the benefits of exclusion outweigh the benefits of designation.  The Service followed that procedure here (albeit in a flawed manner, according to Weyerhaeuser).  It commissioned a report to estimate the costs of designating the proposed critical habitat, concluded that those costs were not "disproportionate" to the benefits of designation, and "[c]onsequently" declined to "exercis[e] [its] discretion to exclude any areas from [the] designation of critical habitat." App. 190.

*Bennett* explained that the Secretary's "ultimate decision" to designate or exclude, which he "arriv[es] at" after considering economic and other impacts, is reviewable "for abuse of discretion."  520 U. S., at 172.  The Service dismisses that language as a "passing reference . . . not necessarily inconsistent with the Service's understanding,"

14      WEYERHAEUSER CO. *v.* UNITED STATES FISH AND
WILDLIFE SERV.

Opinion of the Court

which is that the Secretary's decision not to exclude an area is wholly discretionary and therefore unreviewable. Brief for Federal Respondents 50. The Service bases its understanding on the second sentence of Section 4(b)(2), which states that the Secretary "*may* exclude [an] area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of [designation]."

The use of the word "may" certainly confers discretion on the Secretary. That does not, however, segregate his discretionary decision not to exclude from the procedure mandated by Section 4(b)(2), which directs the Secretary to consider the economic and other impacts of designation when making his exclusion decisions. Weyerhaeuser's claim is the familiar one in administrative law that the agency did not appropriately consider all of the relevant factors that the statute sets forth to guide the agency in the exercise of its discretion. Specifically, Weyerhaeuser contends that the Service ignored some costs and conflated the benefits of designating Unit 1 with the benefits of designating all of the proposed critical habitat. This is the sort of claim that federal courts routinely assess when determining whether to set aside an agency decision as an abuse of discretion under §706(2)(A). See *Judulang* v. *Holder*, 565 U. S. 42, 53 (2011) ("When reviewing an agency action, we must assess . . . whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." (internal quotation marks omitted)).

Section 4(b)(2) requires the Secretary to consider economic impact and relative benefits before deciding whether to exclude an area from critical habitat or to proceed with designation. The statute is, therefore, not "drawn so that a court would have no meaningful standard against which to judge the [Secretary's] exercise of [his] discretion" not to exclude. *Lincoln*, 508 U. S., at 191.

Because it determined that the Service's decisions not to

exclude were committed to agency discretion and therefore unreviewable, the Court of Appeals did not consider whether the Service's assessment of the costs and benefits of designation was flawed in a way that rendered the resulting decision not to exclude Unit 1 arbitrary, capricious, or an abuse of discretion. Accordingly, we remand to the Court of Appeals to consider that question, if necessary, in the first instance.

*        *        *

The judgment of the Court of Appeals for the Fifth Circuit is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KAVANAUGH took no part in the consideration or decision of this case.