Justice ALITO, concurring in part and dissenting in part.
*2596 It is a sign of our time that the inclusion of a question about citizenship on the census has become a subject of bitter public controversy and has led to today's regrettable decision. While the decision to place such a question on the 2020 census questionnaire is attacked as racist, there is a broad international consensus that inquiring about citizenship on a census is not just appropriate but advisable. No one disputes that it is important to know how many inhabitants of this country are citizens.[1] And the most direct way to gather this information is to ask for it in a census. The United Nations recommends that a census inquire about citizenship,[2] and many countries do so.[3]
Asking about citizenship on the census also has a rich history in our country. Every census, from the very first one in 1790 to the most recent in 2010, has sought not just a count of the number of inhabitants but also varying amounts of additional demographic information. In 1800, Thomas Jefferson, as president of the American Philosophical Society, signed a letter to Congress asking for the inclusion on the census of questions regarding " 'the respective numbers of native citizens, citizens of foreign birth, and of aliens' " " 'for the purpose ... of more exactly distinguishing the increase of population by birth and immigration.' " C. Wright, History and Growth of the United States Census (prepared for the Senate Committee on the Census), S. Doc. No. 194, 56th Cong., 1st Sess., 19 (1900). In 1820, John Quincy Adams, as Secretary of State, was responsible for conducting the census, and consistent with the 1820 Census Act, he instructed the marshals who were charged with gathering the information to ask about citizenship.[4] In 1830, when Martin Van Buren was Secretary of State, a question about citizenship was again included.[5] With the exception of the census of 1840, at least some portion of the population was asked a question about citizenship as part of the census through 2000, after which the question was moved to the American Community Survey, which is sent to only a small fraction of the population. All these census inquiries were made by the Executive pursuant to congressional authorization. None were reviewed by the courts.
Now, for the first time, this Court has seen fit to claim a role with respect to the inclusion of a citizenship question on the census, and in doing so, the Court has set a dangerous precedent, both with regard *2597 to the census itself and with regard to judicial review of all other executive agency actions. For the reasons ably stated by Justice THOMAS, see ante , p. ---- (opinion concurring in part and dissenting in part), today's decision is either an aberration or a license for widespread judicial inquiry into the motivations of Executive Branch officials. If this case is taken as a model, then any one of the approximately 1,000 district court judges in this country, upon receiving information that a controversial agency decision might have been motivated by some unstated consideration, may order the questioning of Cabinet officers and other high-ranking Executive Branch officials, and the judge may then pass judgment on whether the decision was pretextual. What Bismarck is reputed to have said about laws and sausages comes to mind. And that goes for decisionmaking by all three branches.
To put the point bluntly, the Federal Judiciary has no authority to stick its nose into the question whether it is good policy to include a citizenship question on the census or whether the reasons given by Secretary Ross for that decision were his only reasons or his real reasons. Of course, we may determine whether the decision is constitutional. But under the considerations that typically guide this Court in the exercise of its power of judicial review of agency action, we have no authority to decide whether the Secretary's decision was rendered in compliance with the Administrative Procedure Act (APA).
I
The APA authorizes judicial review of "agency action" taken in violation of law, 5 U. S. C. §§ 706(2)(A)-(D), but § 701(a)(2) of the APA bars judicial review of agency actions that are "committed to agency discretion by law." Although we have characterized the scope of § 701(a)(2) as " 'narrow,' " Heckler v. Chaney , 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), there are circumstances in which it applies. And while our cases recognize a strong presumption in favor of judicial review of agency action, see, e.g. , Weyerhaeuser Co. v. United States Fish and Wildlife Serv. , 586 U. S. ----, ----, 139 S.Ct. 361, 370, 202 L.Ed.2d 269 (2018), this "is 'just' a presumption," and like all real presumptions, it may be (and has been) rebutted, Lincoln v. Vigil , 508 U.S. 182, 190, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993).[6]
In considering whether the general presumption in favor of judicial review has been rebutted in specific cases, we have identified factors that are relevant to the inquiry: whether the text and structure of the relevant statutes leave a court with any " 'meaningful standard against which to judge the agency's exercise of discretion,' " Webster v. Doe , 486 U.S. 592, 600, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (quoting Heckler , supra , at 830, 105 S.Ct. 1649 ); whether the matter at hand has traditionally been viewed as committed to agency discretion, see ICC v. Locomotive Engineers , 482 U.S. 270, 282, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987) ; whether the challenged action manifests a "general unsuitability" for judicial review because it involves a "complicated balancing of a number of factors," including judgments regarding the allocation of agency resources or matters otherwise committed to *2598 another branch, Heckler , supra , at 831-832, 105 S.Ct. 1649 ; and whether judicial review would produce "disruptive practical consequences," Southern R. Co. v. Seaboard Allied Milling Corp. , 442 U.S. 444, 457, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979) (applying this factor to the reviewability inquiry under § 701(a)(1) ).
Applying those factors, I conclude that the decision of the Secretary of Commerce to add core demographic questions to the decennial census questionnaire is committed to agency discretion by law and therefore may not be challenged under the APA.[7]
II
A
I start with the question whether the relevant statutory provisions provide any standard that courts can apply in reviewing the Secretary's decision to restore a citizenship question to the census. The provision that directly addresses this question is 13 U. S. C. § 141(a), the statute that vests the Secretary with authority to administer the decennial census. This provision gives the Secretary unfettered discretion to include on the census questions about basic demographic characteristics like citizenship. It begins by providing that the Secretary
"shall, in the year 1980 and every 10 years thereafter, take a decennial census of population ... in such form and content as he may determine , including the use of sampling procedures and special surveys." Ibid. (emphasis added).
The two phrases I have highlighted-"census of population" and "in such form and content as he may determine"-are of immediate importance. A "census of population" is broader than a mere head count. The term is defined as "a census of population ... and matters relating to population ." § 141(g) (emphasis added). Because this definition refers to both "a census of population" and "matters relating to population," the latter concept must include more than a "census of population" in the strict sense of a head count. And it seems obvious that what this additional information must include is the sort of basic demographic information that has long been sought in the census. So the statute clearly authorizes the Secretary to gather such information.
The second phrase, "in such form and content as he may determine," specifies how this information is to be gathered, namely, by a method having the "form and content" that the Secretary "may determine." In other words, this is left purely to the Secretary's discretion. A clearer and less restricted conferral of discretion is hard to imagine.
It is instructive to compare this delegation of authority to the statutory language at issue in one of our most well-known § 701(a)(2) cases, Webster v. Doe , 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632. There, the relevant statute allowed termination of a Central Intelligence Agency employee whenever the Director "shall deem such termination necessary or advisable in the interests of the United States." Id. , at 600, 108 S.Ct. 2047 (internal quotation marks omitted and emphasis deleted). Reasoning that the statute's "shall deem " standard "fairly exudes *2599 deference to the Director," the Court concluded that the text of the statute "appear[ed] ... to foreclose the application of any meaningful judicial standard of review." Ibid.
The § 141(a) language discussed above is even more sweeping than that of the statute in Webster. Unlike the Census Act, the statute in Webster placed a condition on the Director's action-in particular, the requirement that he terminate an employee only after concluding that doing so would further the "interests of the United States." No such condition applies to the Secretary's determination about the form and content of the decennial census, a fact that distinguishes the statute at issue here from others this Court has found to fall outside § 701(a)(2) and thus within courts' power to review. See, e.g., Weyerhaeuser Co. , 586 U. S., at ----, 139 S.Ct., at 370 (statute conditioning agency power to exclude land from critical habitat designation on agency's consideration of " 'economic impact' " of designation and " 'determin[ation] that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat' ").
B
Those arguing in favor of judicial review contend that the § 141(a) language that I have discussed so far is limited by language that follows immediately after. That part of § 141(a) states:
"In connection with any such census [i.e. , the decennial "census of population"], the Secretary is authorized to obtain such other census information as necessary ." (Emphasis added.)
This means, it is argued, that information about citizenship may be obtained by means of the census only if that is "necessary." But this argument is clearly wrong. The information that must be "necessary" (whatever that means in this context) is "other census information." That refers to information other than that obtained in the "census of population," and as explained, the term "census of population" includes not just a head count but other "matters relating to population," a category that encompasses basic demographic information such as citizenship. Accordingly, this argument is definitively refuted by the text of § 141. And although it is not necessary to look beyond that text, it is worth noting that this argument, if accepted, would require that the term "necessary" be given a less than strictly literal meaning; otherwise, it would run contrary to the broad delegation effected by the first portion of § 141(a) by making it all but impossible for the Secretary to include on the census anything other than questions relating to the number of persons living at a particular address. That would be so because it will often not be "necessary" to obtain this information via the census rather than by some other means.
C
Another argument in favor of review relies on 13 U. S. C. § 195, which states:
"Except for the determination of population for purposes of apportionment of Representatives in Congress among the several States, the Secretary shall, if he considers it feasible, authorize the use of the statistical method known as 'sampling' in carrying out the provisions of this title."
Justice BREYER, for example, interprets this provision to mean that "the Secretary must, if feasible, obtain demographic information through a survey sent to a sample of households, rather than through the short-form census questionnaire to which every household must respond." Ante , at 2585 (opinion concurring in part and dissenting in part). Under that reading of § 195, it is asserted, the provision sets *2600 forth a judicially reviewable limit on the Secretary's authority to obtain information through direct inquiries.
This argument fails to take into account that the current version of § 195 was enacted as part of the same Act of Congress that included the present version of § 141[8] and that the two provisions are both parts of a unified scheme regarding the use of sampling. Section 141, a provision concerned exclusively with the census, addresses the use of sampling in that particular context. I previously quoted the relevant language, but I repeat it now so that it is clearly in mind. Section 141(a) provides that the Secretary
"shall, in the year 1980 and every 10 years thereafter, take a decennial census of population ... in such form and content as he may determine, including the use of sampling procedures and special surveys ." (Emphasis added.)
What this means is that the Secretary, in conducting the "census of population," has discretion to choose the form and content of the vehicles used in that project, and among the methods that he may employ, if he sees fit, are sampling and special surveys.
Section 195 is not a census-specific provision, but it does have one (important) thing to say specifically about the census: It prohibits the use of sampling "for the determination of population for purposes of apportionment of Representatives in Congress." In this one way, it qualifies the Secretary's discretion regarding the "form and content" of the vehicles used in conducting the "census of population." And that is what we meant in Department of Commerce v. United States House of Representatives , 525 U.S. 316, 338, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999), when we said that § 141(a) 's "broad grant of authority ... is informed ... by the narrower and more specific § 195." Otherwise, the text of § 195 does not deal specifically with the census. It addresses all the many information-gathering activities conducted by the Commerce Department, and as to these, it says that the Secretary shall use sampling if he deems it "feasible."
If § 195 were read to mean that no information other than a head count can be sought by means of a census questionnaire unless it is not "feasible" to get that information by sampling, then there would be little if anything left of the broad discretion "to use sampling techniques" conferred on the Secretary by § 141(a). "Feasible" means "capable of being done, executed, or effected," Webster's Third New International Dictionary 831 (1961), and it is not clear that the gathering of any core demographic information is not "capable of being done" by sampling. So if that were what § 195 means, then Congress, in the same Act, would have given the Secretary discretion to use sampling in the census "as he may determine" but also compelled him to use sampling in almost all instances. That is no way to read the provisions of a single Act. A law's provisions should be read to work together. See A. Scalia & B. Garner, Reading Law 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory"). See also, e.g. , Parker Drilling Management Services, Ltd. v. Newton , 587 U. S. ----, ---- - ----, 139 S.Ct. 1881, 1887-1889, L.Ed.2d ---- (2019) (slip op., at 5-6) ; Star Athletica, L. L. C. v. Varsity Brands, Inc. , 580 U. S. ----, ---- - ----, 137 S.Ct. 1002, 1009-1010, 197 L.Ed.2d 354 (2017) ; Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp. , 561 U.S. 89, 108, 130 S.Ct. 2433, 177 L.Ed.2d 424 (2010). And if there is tension between a specific provision, like *2601 § 141 's instruction regarding the use of sampling in the decennial census, and a general one, like § 195 's directive regarding the use of sampling in all data-collection activities, the specific provision must take precedence. Cf. NLRB v. SW General, Inc. , 580 U. S. ----, ----, 137 S.Ct. 929, 941-942, 197 L.Ed.2d 263 (2017).
When §§ 141 and 195 are read in this way, it is easy to see how they fit together. In using the census to gather information "relating to population" for any use other than the actual enumeration, the Secretary may use sampling "as he may determine." In conducting all the Department's efforts to collect data by other means, he may authorize the use of sampling if he thinks that is "feasible." The upshot for present purposes is that § 195 does not require the "counterintuitive resul[t]" of barring the Secretary from including on the census questionnaire the kinds of basic demographic questions that have been asked as part of every census in U. S. history. RJR Nabisco, Inc. v. European Community , 579 U. S. ----, ----, 136 S.Ct. 2090, 2104, 195 L.Ed.2d 476 (2016).
D
One additional provision, 13 U. S. C. § 6(c),[9] requires close consideration. This provision, which was enacted in 1976 in the same Act as §§ 141(a) and 195, has three subsections. Subsection (a) provides that the Secretary may call on other components of the Federal Government to obtain information that is "pertinent to" the Department's work. Subsection (b) authorizes the Secretary to "acquire, by purchase or otherwise" from state and local governments and private sources "such copies of records, reports, and other material as may be required for the efficient and economical conduct of the censuses and surveys provided for in this title." Finally, subsection (c) provides:
"To the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary shall acquire and use information available from any source referred to in subsection (a) or (b) of this section instead of conducting direct inquiries."
The District Court interpreted subsection (c) to mean that the Secretary must turn to another federal agency or outside source for demographic information (rather than seeking the information on the census) unless doing so would not be "possible" or "consistent with the kind, timeliness, quality and scope of the statistics required." This argument fails for reasons similar to those that sank the § 195 argument just discussed. Section 6(c) is not a census-specific provision but instead applies generally to all the Commerce Department's information-gathering activities. If it is read to apply to the "census of population," it cannot be reconciled with § 141(a), which, as noted, broadly authorizes the Secretary to use that vehicle for obtaining information "relating to population,"
*2602 i.e. , core demographic information. If § 6(c) applied to the gathering of such information, it would make it hard to justify the inclusion of any demographic questions on the census, even though this has been done since 1790. (Is it not possible to get information about age and sex, for example, from any outside source (or combination of sources), even if the Department offers to acquire it from a private source by purchase?) Reading § 6(c) to mean what the District Court thought would turn it into the proverbial elephant stuffed into a mouse hole. Section 6(c), however, is a decidedly mouse-like provision. It was enacted with no fanfare and no real explanation,[10] and remained in the shadows, virtually unused and unnoticed, for more than 40 years.
E
Respondents and the Court cite two other provisions in support of reviewability, but neither has anything to do with the issue of putting a citizenship question on the census. In determining whether statutory provisions include standards that could provide a basis for judicial review, it is necessary to focus on the precise claims at issue, see, e.g., Webster , 486 U.S. at 601-602, 108 S.Ct. 2047 (distinguishing between statutory and constitutional claims); Locomotive Engineers , 482 U.S. at 277-279, 107 S.Ct. 2360 (parsing claims under different prongs of reopener statute); Heckler , 470 U.S. at 836, 105 S.Ct. 1649 (rejecting as "irrelevant" to the agency decision at issue two statutory provisions that were argued to provide " 'law to apply' "). And when viewed in this way, the remaining statutory provisions cited in support of reviewability are of no value.
Respondents point to § 141(b), which requires the Secretary to complete the tabulation of total population by States "within 9 months after the census date" and then to report the results to the President. That provision sets out an easily administered deadline, and it has nothing to do with the content of the census questionnaire.
Respondents also claim that § 141(f) is relevant to the question of judicial review, but that provision concerns congressional review. It directs the Secretary to report to Congress, at specified times, the subjects and questions that he intends to include on the census. According to respondents, the Secretary's compliance with those requirements is judicially reviewable, and that, they contend, takes the Secretary's decision to include a citizenship question out from under § 701(a)(2).
Respondents fundamentally misunderstand the significance of congressional reporting requirements in evaluating whether a particular agency action is subject to judicial review. Congressional reporting requirements are "legion in federal law," Natural Resources Defense Council, Inc. v. Hodel , 865 F.2d 288, 317 (CADC 1988), and their purpose is to permit Congress to monitor and, if it sees fit, to correct Executive Branch actions to which it objects. When a congressional reporting requirement "[l]ack[s] a provision for judicial review," compliance "by its nature seems singularly committed to congressional discretion in measuring the fidelity of the *2603 Executive Branch actor to legislatively mandated requirements." Id. , at 318. In other words, it is Congress, not the Judiciary, that is best situated to determine whether an agency's responses to Congress are sufficient and, if not, to "take what it deems to be the appropriate action." Id. , at 319.
In that respect, § 141(f) actually cuts against judicial review. The Constitution gives Congress the authority to "direct" the "Manner" in which the census is conducted, and by imposing the § 141(f) reporting requirements, Congress retained some of that supervisory authority. It did not transfer it to the courts.[11]
Respondents protest that congressional review may not be enough to guard against a Secretary's abuses, especially when the party in control of Congress stands to benefit. But that complaint simply expresses disagreement with the Framers' choice to vest power over the census in a political body, cf. Baldrige v. Shapiro , 455 U.S. 345, 347-348, 102 S.Ct. 1103, 71 L.Ed.2d 199 (1982) ("Under [the] Constitution, responsibility for conducting the decennial census rests with Congress"), and the manner in which Congress has chosen to exercise that power, see Wisconsin v. City of New York , 517 U.S. 1, 19, 116 S.Ct. 1091, 134 L.Ed.2d 167 (1996) (Congress has delegated its "virtually unlimited discretion" in conducting the census to the Secretary). In any event, the ability to press constitutional challenges to the Secretary's decisions, see n. 7, supra, answers many of the examples in respondents' parade of horribles.
In short, the relevant text of § 141(a) "fairly exudes deference" to the Secretary. Webster , 486 U.S. at 600, 108 S.Ct. 2047. And no other provision of law cited by respondents or my colleagues provides any "meaningful judicial standard" for reviewing the Secretary's selection of demographic questions for inclusion on the census. Ibid.
III
In addition to requiring an examination of the text and structure of the relevant statutes, our APA § 701(a)(2) cases look to whether the agency action in question is a type that has traditionally been viewed as committed to agency discretion or whether it is instead one that "federal courts regularly review." Weyerhaeuser Co. , 586 U. S., at ----, 139 S.Ct., at 370. In cases where the Court has found that agency action is committed to agency discretion by law, an important factor has been the absence of an established record of judicial review prior to the adoption of the APA. See Heckler , 470 U.S. at 832-833, 105 S.Ct. 1649 (agency nonenforcement); Locomotive Engineers , 482 U.S. at 282, 107 S.Ct. 2360 (agency decision not to reopen final decision based on material error); Lincoln , 508 U.S. at 192, 113 S.Ct. 2024 (agency use of lump-sum appropriations).
*2604 Here, there is no relevant record of judicial review. We are confronted with a practice that reaches back two centuries. The very first census went beyond a mere head count and gathered additional demographic information, and during virtually the entire period prior to the enactment of the APA, a citizenship question was asked of everyone. Notably absent from that long record is any practice of judicial review of the content of the census. Indeed, this Court has never before encountered a direct challenge to a census question. App. to Pet. for Cert. 416a. And litigation in the lower courts about the census is sparse and generally of relatively recent vintage.
Not only is this sort of history significant in all § 701(a)(2) cases, see Locomotive Engineers , supra , at 282, 107 S.Ct. 2360, but we have previously stressed the particular "importance of historical practice" when it comes to evaluating the Secretary's authority over the census. Wisconsin , supra , at 21, 116 S.Ct. 1091 ; see also ante, at 2567 (opinion of the Court). Moreover, where the relevant question is not whether review may be had at all, but rather the branch with the authority to exercise review, the absence of any substantial record of judicial review is especially revealing. See, e.g., NLRB v. Noel Canning , 573 U.S. 513, 525, 134 S.Ct. 2550, 189 L.Ed.2d 538 (2014) (it is "neither new nor controversial" that "longstanding practice of the government can inform our determination of what the law is" (internal quotation marks and citation omitted)); United States v. Midwest Oil Co. , 236 U.S. 459, 473, 35 S.Ct. 309, 59 L.Ed. 673 (1915) ("in determining ... the existence of a power, weight [is] given to ... usage"). Thus, the absence of any real tradition of judicial review of decisions regarding the content of the census counsels against review in this case.
In an attempt to show that there is no relevant "tradition of nonreviewability," Locomotive Engineers , supra , at 282, 107 S.Ct. 2360, respondents contend that this Court has recently engaged in review of the "conduct of the census," Brief for Government Respondents 26-27. But in none of the cases they cite did the Court address an APA challenge to the content of census questions.[12] Some involved constitutional claims about enumeration and apportionment. See Franklin v. Massachusetts , 505 U.S. 788, 790, 801, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992) (constitutional challenge to "method used for counting federal employees serving overseas" as part of "reapportionment determination"); Wisconsin , 517 U.S. at 20, 116 S.Ct. 1091 (constitutional challenge to Secretary's decision not to adjust count). Others concerned enforcement of statutes with specific directives. See Department of Commerce , 525 U.S. at 343, 119 S.Ct. 765 (holding that § 195 bars use of "sampling" to reach actual enumeration for apportionment); Utah v. Evans , 536 U.S. 452, 464-465, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002) (considering whether statistical method violated § 195 's bar on use of "sampling" in apportionment enumeration). According to respondents, these cases mean that all the Secretary's census-related decisions are suitable for judicial review and thus fall outside of § 701(a)(2), and the Court apparently agrees, rejecting the Government's § 701(a)(2) argument in part because "[w]e and other courts have entertained both constitutional and statutory challenges to census-related decisionmaking." Ante , at 2568.
*2605 This argument misses the point of § 701(a)(2). The question under that provision is whether the challenged action "is committed to agency discretion by law," not whether a different action by the same agency is reviewable under the APA, much less whether an action taken by the same agency can be challenged under the Constitution. Take the example of Heckler v. Chaney , supra , where the Court considered whether a particular Food and Drug Administration (FDA) decision was reviewable under the APA. Many FDA actions are subject to APA review, see, e.g., Weinberger v. Hynson, Westcott & Dunning, Inc. , 412 U.S. 609, 627, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973), but that did not prevent the Heckler Court from holding that the particular FDA decision at issue there fell within § 701(a)(2). See also, e.g. , Heckler , supra, at 836-837, 105 S.Ct. 1649.
Respondents and some of their amici contend that the Secretary's decision is at least amenable to judicial review for consistency with the APA's reasoned-explanation requirement. See Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co. , 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (describing requirement). Thus, the argument goes, even if no statute sets out a standard that can be used in reviewing the particular agency action in question, a court may review an agency's explanation of the reasons for its action and set it aside if the court finds those reasons to be arbitrary or irrational.
This argument would obliterate § 701(a)(2). Even if a statute expressly gave an agency absolute, unrestricted, unfettered, unlimited, and unqualified discretion with respect to a particular decision, a court could still review the agency's explanation of the reasons for its decision. That is not what § 701(a)(2) means. As we put it previously in answering a similar argument against application of § 701(a)(2), it is "fals[e]" to suggest "that if the agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." Locomotive Engineers , 482 U.S. at 283, 107 S.Ct. 2360. That is because when an action "is committed to agency discretion by law," the Judiciary has no role to play, even when an agency sets forth "an eminently 'reviewable' proposition." Id., at 282-283, 107 S.Ct. 2360.
IV
In sum, neither respondents nor my colleagues have been able to identify any relevant, judicially manageable limits on the Secretary's decision to put a core demographic question back on the census. And without an "adequate standard of review for such agency action," id. , at 282, 107 S.Ct. 2360, courts reviewing decisions about the "form and content" of the census would inevitably be drawn into second-guessing the Secretary's assessment of complicated policy tradeoffs,[13] another indicator of "general unsuitability" for judicial review. Heckler , supra , at 831, 105 S.Ct. 1649.
Indeed, if this litigation is any indication, widespread judicial review of the Secretary's conduct of the census will usher in an era of "disruptive practical consequences,"
*2606 and this too weighs against review. Seaboard Allied Milling Corp. , 442 U.S. at 457, 99 S.Ct. 2388. Cf. Tucker v. United States Dept. of Commerce , 958 F.2d 1411, 1418 (CA7 1992) (expressing doubt about "both the provenance and the practicability" of allowing judicial review of census-related decisions).
Respondents protest that the importance of the census provides a compelling reason to allow APA review. See also ante, at 2595 (opinion of BREYER, J.). But this argument overlooks the fact that the Secretary is accountable in other ways for census-related decisionmaking.[14] If the Secretary violates the Constitution or any applicable statutory provision related to the census, his action is reviewable. The Secretary is also accountable to Congress with respect to the administration of the census since he has that power only because Congress has found it appropriate to entrust it to him. And the Secretary is always answerable to the President, who is, in turn, accountable to the people.
* * *
Throughout our Nation's history, the Executive Branch has decided without judicial supervision or interference whether and, if so, in what form the decennial census should inquire about the citizenship of the inhabitants of this country. Whether to put a citizenship question on the 2020 census questionnaire is a question that is committed by law to the discretion of the Secretary of Commerce and is therefore exempt from APA review. The District Court had the authority to decide respondents' constitutional claims, but the remainder of their complaint should have been dismissed.
I join Parts I, II, III, IV-B, and IV-C[15] of the opinion of the Court. I do not join the remainder, and insofar as the Court holds that the Secretary's decision is reviewable under the APA, I respectfully dissent.

Justice KAVANAUGH and I join Parts I, II, III, and IV of the opinion of the Court. Justice GORSUCH joins Parts I, II, III, IV-B, and IV-C.

Justice ALITO has made a strong argument that the specific decision at issue here-whether to include a citizenship question on the census-is a matter "committed to agency discretion by law." 5 U. S. C. § 701(a)(2) ; see post , at 2596 - 2597 (opinion concurring in part and dissenting in part). As he explains, the Secretary's decision plainly falls within the scope of the Secretary's constitutional authority, does not implicate any statutory prohibition, and is among the "inquiries" and "content[s]" of the census that the Secretary is expressly directed to "determine" for himself. §§ 5, 141(a) ; see post , at 2598 - 2603. Nevertheless, I assume, for the purpose of this opinion, that the Secretary's decision is subject to judicial review.

Deferential review of the agency's discretionary choices and reasoning under the arbitrary-and-capricious standard stands in marked contrast to a court's plenary review of the agency's interpretation and application of the law. See §§ 706(A)-(D) (court must review agency action to ensure that it complies with all "constitutional," "statutory," and "procedur[al]" requirements, and is otherwise "in accordance with law").

See Act of Mar. 14, 1820, ch. 24, 3 Stat. 550; Wright, History and Growth of the United States Census, S. Doc. No. 194, 56th Cong., 1st Sess., 133-137.

See Dept. of Commerce, Census Bureau, History: 1830 Census Questionnaire, https://www.census.gov/history/www/through_the_decades/questionnaires/1830_2.html.

Because the § 701(a)(2) analysis dictates whether APA review may be had, Justice BREYER's assertion that the APA "supplies [a] limit" on the Secretary's otherwise "broad" delegation, ante , at 2595 (opinion concurring in part and dissenting in part), mistakenly assumes the answer to the reviewability question. Cf. Heckler v. Chaney , 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ("[B]efore any review at all may be had, a party must first clear the hurdle of § 701(a)").

The Government concedes that courts may review constitutional challenges to the Secretary's actions. Cf. Webster v. Doe , 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988). For the reasons given in the Court's opinion, see ante , at 2566 - 2567, I agree that the only remaining constitutional claim at issue-respondents' Enumeration Clause claim-lacks merit and thus does not constitute a basis for enjoining the addition of the citizenship question.

See 90 Stat. 2459.

Section 6 states:
"(a) The Secretary, whenever he considers it advisable, may call upon any other department, agency, or establishment of the Federal Government, or of the government of the District of Columbia, for information pertinent to the work provided for in this title.
"(b) The Secretary may acquire, by purchase or otherwise, from States, counties, cities, or other units of government, or their instrumentalities, or from private persons and agencies, such copies of records, reports, and other material as may be required for the efficient and economical conduct of the censuses and surveys provided for in this title.
"(c) To the maximum extent possible and consistent with the kind, timeliness, quality and scope of the statistics required, the Secretary shall acquire and use information available from any source referred to in subsection (a) or (b) of this section instead of conducting direct inquiries."

The most respondents can muster are snippets from the legislative history of the 1976 Census Act indicating that § 6(c) was enacted to decrease the Secretary's use of "direct inquiries" in the interest of "reducing respondent burden." H. R. Rep. No. 94-1719, p. 10 (1976). Even accepting that premise, it simply raises the same question just discussed-namely, whether Congress's desire to reduce respondent burden, as reflected by § 6(c), yields to the Secretary's broad authorization in § 141(a) to "determine" the "form and content" of any direct inquiries on the census. Cf. id., at 11 (characterizing § 141 as a "provisio[n] directly related to decennial ... census").

It is notable that Congress, pursuant to its supervisory authority, has in some cases limited the particular demographic characteristics about which the Secretary may require information through census questionnaires. In § 221(c), for example, Congress has dictated that "no person shall be compelled to disclose information relative to his religious beliefs or to membership in a religious body." Similarly, in a series of appropriation Acts, Congress has specified that "none of the funds provided in this or any other Act for any fiscal year may be used for the collection of census data on race identification that does not include 'some other race' as a category." 123 Stat. 3115, note following 13 U. S. C. § 5. Those examples highlight that when Congress wishes to limit the Secretary's authority to require responses to particular demographic questions, it "knows precisely how to do so." Limelight Networks, Inc. v. Akamai Technologies, Inc. , 572 U.S. 915, 923, 134 S.Ct. 2111, 189 L.Ed.2d 52 (2014).

The same can be said for the lower court cases on which respondents rely. See, e.g., Brief for Government Respondents 26, and n. 6 (collecting cases, none of which "involved the census questionnaire" or the Secretary's selection of questions).

In determining how the census is to be conducted, the Secretary must make decisions about a bevy of matters, such as the best way to count particular persons or categories of persons with an adequate degree of accuracy (e.g. , by face-to-face interviews, telephone calls, questionnaires to be mailed back, contacts with neighbors, or use of existing records); the use of followup procedures and other quality control measures; which persons should be included in which households; and issues concerning where a person should be enumerated. These and countless other factors may affect whether an individual receives or responds to the census questionnaire.

Since the time Secretary Ross publicly announced his intent to add the citizenship question, "Congress has questioned the Secretary about his decision in public hearings on several occasions." Brief for Petitioners 50 (collecting examples).

Although I would hold that the Secretary's decision is not reviewable under the APA, in the alternative I would conclude that the decision survives review under the applicable standards. I join Parts IV-B and IV-C on that understanding.