# United States Court of Appeals
## For the First Circuit

No. 20-1397

MARASCO & NESSELBUSH, LLP,

Plaintiff, Appellant,

v.

TARA COLLINS, individually and in her official capacity as
Supervisory Attorney of ODAR; CAROLYN TEDINO, individually and
in her official capacity as Regional Management Officer for the
Boston Region of the Social Security Administration; SOCIAL
SECURITY ADMINISTRATION, by and through Andrew M. Saul,
Commissioner of the Social Security Administration; JANE DOE, in
her individual capacity and official capacity as an Employee of
the Social Security Administration,

Defendants, Appellees,

JOSEPH P. WILSON, individually in his capacity as a former
Associate at M&N and in his official capacity as Attorney
Advisor for ODAR; PAUL E. DORSEY, individually in his capacity
as a former Associate at M&N and in his official capacity as
Attorney Advisor for ODAR; KYLE E. POSEY, individually in his
capacity as a former Associate at M&N and in his official
capacity as Attorney Advisor for Social Security Administration,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Howard, <u>Chief Judge</u>,
Lipez and Thompson, <u>Circuit Judges</u>.

———————————

    <u>Timothy K. Baldwin</u>, with whom <u>Robert C. Corrente</u>, <u>Caroline R. Thibeault</u>, and <u>Whelan Corrente & Flanders LLP</u> were on brief, for appellant.

    <u>Dennis Fan</u>, with whom <u>Ethan P. Davis</u>, Acting Assistant Attorney General; <u>Aaron L. Weisman</u>, United States Attorney; <u>Charles W. Scarborough</u>, Attorney, Civil Division, Appellate Staff, U.S. Department of Justice; <u>Royce Min</u>, General Counsel, Social Security Administration; <u>Michael J. Pelgro</u>, Regional Chief Counsel, Social Security Administration; <u>Timothy S. Bolen</u>, Assistant Regional Counsel, Social Security Administration, and <u>Amy Rigney</u>, Attorney, Social Security Administration, were on brief for appellees.

———————————

July 16, 2021

———————————

**LIPEZ**, **Circuit Judge**. Appellant Marasco & Nesselbush, LLP ("M&N"), a law firm, brought this action to challenge what it describes as "the Social Security Administration's byzantine and irrational rules that govern payment of attorney's fees in Social Security disability cases." The district court dismissed M&N's claims for mandamus and relief under the Administrative Procedure Act ("APA"), and it granted summary judgment for the Social Security Administration ("SSA") on M&N's equal protection and due process claims. We affirm dismissal of one APA claim, vacate dismissal of the other, and conclude that certain of the payment rules challenged by M&N are arbitrary and unenforceable. Given the availability of relief under the APA, we affirm dismissal of M&N's claim for mandamus relief and vacate the avoidable ruling on the constitutional claims.

## I.

M&N is a Rhode Island law firm whose partners and associate attorneys regularly represent claimants seeking Social Security disability benefits. A detailed framework created by statute and regulations, and fleshed out in two agency manuals, specifies the procedures for obtaining benefits, including who may represent Social Security claimants and how representatives may obtain fees for work they perform for claimants. See, e.g., 42 U.S.C. § 406 ("Representation of claimants before Commissioner"); 20 C.F.R. §§ 404.1705 ("Who may be your representative"); 404.1725

- 3 -

("Request for approval of a fee"); Program Operations Manual System ("POMS") § GN 03910.020 ("Qualifications for and Recognition of Representatives"); POMS § GN 03920.017 ("Payment of Representative's Fee"); Hearings, Appeals, and Litigation Law Manual ("HALLEX") § I-1-2-3 ("Representative(s) Who May Charge and Collect a Fee"). The two SSA manuals -- POMS and HALLEX -- each contain numerous provisions that guide the agency's decision-making while also informing the public of the requirements and procedures for seeking benefits.[1]

We describe below the primary aspects of this agency framework, as relevant to M&N's claims.

## A. SSA Representation

Pursuant to regulation, as elaborated by the POMS and HALLEX manuals, only individual attorneys, and not law firms, may serve as "representatives" of claimants in agency proceedings.[2]

---

[1] The homepage on the POMS public website explains that "[t]he POMS is a primary source of information used by Social Security employees to process claims for Social Security benefits." POMS, https://secure.ssa.gov/apps10/ (last visited July 13, 2021). The introductory section of HALLEX states that, inter alia, "HALLEX defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the hearing, Appeals Council, and civil action levels." HALLEX § I-1-0-1 ("Purpose").

[2] Claimants also may appoint non-attorney individuals as representatives, see, e.g., 42 U.S.C. § 406(a)(1), but this opinion addresses the regulatory scheme only with respect to attorneys. In addition, the framework at issue here applies only to representation by attorneys during administrative proceedings, not for any legal work that may later be performed in court if the agency denies benefits. See id. § 406(b).

- 4 -

See, e.g., 20 C.F.R. § 404.1705(a) (stating that a claimant may "appoint as [his/her] representative . . . any attorney in good standing who" meets certain requirements); POMS § GN 03920.001.A ("A claimant may appoint an individual, attorney or non-attorney, to represent him/her in matters before SSA."); HALLEX § I-1-1-10.E ("An organization cannot represent a claimant because SSA does not recognize entities or other organizations as representatives."). When claimants retain a representative, they must notify the SSA in writing, and the agency provides a form for that purpose -- SSA-1696, titled "Appointment of Representative."[3] See POMS § GN 03905.030.A; HALLEX §§ I-1-1-10.A, I-1-2-3.A. A claimant may retain more than one representative, but separate written notices must be filed for each representative and the claimant "must specify a principal representative." HALLEX § I-1-1-10.D.

Consistent with these rules, SSA claimants who seek representation from M&N initially complete an SSA-1696 to appoint one of the firm's two partners, Joseph Marasco or Donna Nesselbush, as both their "representative" and their "main representative." Subsequently, when an associate is assigned to assist with a case, the client completes a new SSA-1696 to appoint the associate as an

---

[3] Unlike non-attorney representatives, attorneys are not required to sign a notice of appointment, see HALLEX § I-1-1-10.A, but they are "strongly encourage[d]" to do so, id. § I-1-1-10.B.

additional representative, with the M&N partner assigned to the case identified on the associate's form as the main representative.

**B. Attorney's Fees for SSA Representation**

By statute, attorneys who successfully represent Social Security disability claimants are entitled to a "reasonable fee" for their services. See 42 U.S.C. § 406(a)(1). In some circumstances, attorneys also are eligible for fees despite the SSA's rejection of their clients' benefits claims. See 20 C.F.R. § 404.1725(b)(2); see also Gisbrecht v. Barnhart, 535 U.S. 789, 794-95 (2002) (noting the fees mandate for favorable determinations and the regulatory provision permitting fees "if the benefits claimant was unsuccessful"). With exceptions not relevant here, attorneys are required to obtain SSA authorization to collect fees for their work on behalf of claimants in agency proceedings. See 42 U.S.C. § 406(a)(1) (stating that the Commissioner of Social Security shall "fix . . . a reasonable fee to compensate" attorneys for representing claimants who are awarded benefits); 20 C.F.R. § 404.1720(b)(1) (stating that a "representative must file a written request with [the SSA] before he or she may charge or receive a fee for his or her services").

If attorneys serving as representatives follow prescribed procedures, the SSA will directly pay at least a portion of the authorized fees from funds it withholds for that purpose from claimants' past-due benefits. See 42 U.S.C. § 406(a)(4)

- 6 -

(providing for certification of an attorney's fee from a claimant's past-due benefits); 20 C.F.R. § 404.1720(b)(4) (stating that, subject to requirements specified elsewhere, the agency "will pay the authorized fee, or a part of the authorized fee, directly to the attorney . . . out of the past-due benefits").  Pursuant to statute, the maximum amount of fees that the SSA may pay from withheld funds is 25 percent of the past-due benefits.  42 U.S.C. § 406(a)(4).[4]  The procedures challenged by M&N primarily concern the payments drawn from the withheld past-due benefits.

Particularly significant in this case is the rule that "[o]nly the claimant's duly appointed representative(s) may charge or collect a fee for services he or she provided in a matter before the Social Security Administration (SSA)."  HALLEX § I-1-2-3.A. Because the SSA's rules allow only individuals to serve as representatives, the agency pays fees from claimants' past-due benefits only to individual attorneys.  See POMS § GN 03910.042.A.3 ("NOTE: SSA recognizes and pays fees directly only to individual representatives, not entities.").  The agency applies that limitation even when it recognizes that the fees at issue will be

---

[4] In a separate subsection, the statute also provides for withholding and payment of up to 25 percent of a claimant's past-due benefits for representation in court.  See 42 U.S.C. § 406(b)(1)(A).  The Supreme Court recently held that the 25 percent cap applies separately to each subsection.  See Culbertson v. Berryhill, 139 S. Ct. 517, 519 (2019) (holding that "the statute does not impose a 25% cap on aggregate fees").

transferred to the representing attorneys' employers -- i.e., their law firms -- because the individual attorneys have been paid for their SSA work as part of their regular salaries. See, e.g., HALLEX § I-1-2-3.A ("If a law firm or other entity is involved, only the duly appointed individual(s) in that firm or entity may file a fee agreement or petition and receive fee authorization and payment for services performed."); POMS § GN 03910.042.A.3 (providing for the registration of "[a] firm or other entity" that employs a representative).

The SSA's awareness of a law firm's ultimate entitlement to the fees is reflected in the agency's reporting to the Internal Revenue Service. When the proper documents have been filed with the SSA, the law firm will be sent a 1099-MISC form "indicating the amount of any fees paid directly to their employees," POMS § GN 03913.001.D.1, and the individual attorney who received the payments will be provided "an informational Form 1099-MISC that reflects a representative's income passed to the firm," Defendants' Response to Plaintiff's Statement of Undisputed Facts, at ¶ 24, Dkt. 47, No. 1:17-cv-00317-JJM-LDA (May 30, 2019). Indeed, the SSA "recommend[s] that firms and organizations employing individual representatives register with [SSA], even though [SSA] do[es] not pay fees directly to firms and organizations." POMS § GN 03913.001.D.1.

Pursuant to statute and regulation, the SSA provides two methods for attorneys to seek fees: fee agreements made between the attorneys and their clients, and fee petitions. See POMS §§ GN 03920.001, 03920.017; 03905.035.B. The procedures differ in multiple ways. For example, a fee agreement must be submitted to the SSA before the agency reaches a benefits determination, and the agreed-upon fee is payable only if the claimant is successful. See 42 U.S.C. § 406(a)(2)(A). By contrast, a fee petition is submitted to the SSA after the attorney completes his or her representation, and fees are payable regardless of success. See 20 C.F.R. § 404.1725. In fee agreement cases, the SSA does not consider the actual hours spent or the services provided when deciding whether to approve the agreement, see POMS § GN 03940.003.C.1, but those factors are among the criteria considered when the SSA evaluates fee petitions, see POMS § GN 03930.105.B.1, 4; HALLEX § I-1-2-57.A.2, 5.

By statute, the fee specified in an agreement may not exceed the lesser of $6,000 or 25 percent of the claimant's award of past-due benefits. See 42 U.S.C. § 406(2)(A); 74 Fed. Reg. 6080 (Feb. 4, 2009). The agreed-upon fee is also the maximum that the representative may collect, either directly from the SSA (from the client's withheld benefits) or from the client. See POMS § GN 03920.001.B.2. Through the petition process, the SSA may award any amount deemed "reasonable" based on the specified regulatory

- 9 -

criteria. See POMS § GN 03920.001.B.1 (referencing 42 U.S.C. § 406(a)(1)); 20 C.F.R. §§ 404.1720(b)(2), 404.1725; HALLEX § I-1-2-57. However, as with fee agreements, the SSA will directly pay an attorney who submits a fee petition a maximum of 25 percent of the claimant's past-due benefits; any remaining authorized amount would need to be collected from the client. See, e.g., POMS §§ GN 03920.050.C; 03905.035.B.

As an indication of the complexity of the framework, different rules apply to each method of obtaining fees when a claimant has more than one representative. In fee agreement cases, all representatives seeking fees must sign a single agreement; in fee petition cases, each representative must file a separate petition for the services he or she performed. HALLEX § I-1-2-3.B. When issuing payments from a claimant's award of past-due benefits in fee agreement cases, the SSA will split the authorized amount "in equal shares to each appointed representative without regard to his or her services." POMS § GN 03920.050.D.2.[5] For fee petitions, by contrast, the SSA will "apportion (i.e., prorate) the withheld amount among the eligible representatives." Id. § 03920.050.D.1. In other words, for fee petitions, the SSA

---

[5] M&N states in its complaint that, pursuant to this rule, "[i]f an associate attorney's involvement in the case consisted of answering one five-minute phone call, while the partner worked 50 hours on the case, the SSA would still authorize" half the available fee to each.

- 10 -

will use the individual fee amounts that were authorized to compute each representative's percentage of the total amount of authorized fees; the SSA will award the available withheld benefits based on those percentages.  Id.

**C. M&N's SSA Fee-Collecting Experience**[6]

For both fee agreements and fee petitions, the SSA -- as noted above -- will make payments only to individuals, not to firms.  M&N has thus devised a system for ensuring that fees paid to its salaried associates are properly transferred to the firm. First, M&N associates sign a "Limited Power of Attorney" authorizing the partners to recover any representative's fees that the SSA pays to the individual attorneys.[7]  Second, M&N establishes

---

[6] Unless noted otherwise, we draw the facts concerning M&N from the undisputed portions of its Statement of Undisputed Facts. All references to M&N's "complaint" and citations to its complaint refer to the First Amended Complaint.

[7] In pertinent part, that document states:  "I acknowledge that I am a salaried employee of Marasco & Nesselbush, and I warrant that I do not represent any Social Security clients outside of the employ of Marasco & Nesselbush."  It further authorizes M&N's partners:

> [t]o duly execute my name on drafts issued by the Social Security Administration to me as payment of attorneys fees for legal services rendered to clients of Marasco & Nesselbush, while I was employed by Marasco & Nesselbush as an associate and further to execute my name on all fee petitions or fee related documents relative to the above stated limited purpose . . . [and] [t]o take all reasonable steps to deposit said drafts/attorney fees [into] Marasco & Nesselbush bank accounts.

joint bank accounts with each associate for receipt of the SSA electronic fee deposits. Third, after the SSA deposits fees into those joint accounts, and pursuant to the Limited Power of Attorney, M&N transfers the funds to the firm's operating account.

As described below, however, M&N's system does not always successfully retrieve all fees to which the firm claims entitlement based on the SSA work performed by its associates -- a problem that M&N attributes to the SSA's allegedly irrational framework. M&N also claims burdens from fee issues that arise when it hires attorneys who had been representing Social Security disability claimants at other firms.

### 1. Attorney's Fees for SSA Work Performed by M&N Associates Who Leave the Firm

M&N alleges that it regularly has problems obtaining attorney's fees from the SSA for work done by its associates when those associates move to other firms or obtain jobs with the SSA or another government agency. The difficulties, as depicted in M&N's complaint, stem both from the intricacies of the SSA's procedures and from the lag in time that frequently occurs between fee requests and payment.[8] We briefly describe the alleged complications for the two primary scenarios that M&N identifies.

---

[8] M&N's complaint states that "[t]he fee petition method is very slow; it can sometimes take years after the claimant is awarded benefits to receive authorization for attorney's fees, and then several more months for the attorney to actually receive the fee." Compl. ¶ 20; see also id. ¶ 45 ("Social Security disability

**a. Changing Law Firms.** If M&N associates leave the firm during the pendency of a Social Security case on which they have worked -- a sometimes lengthy period -- M&N must maintain ties with those former employees and seek their cooperation in submitting fee petitions so that M&N can be paid for work the associates performed (and for which the associates previously were paid through their salaries). M&N also must keep escrow accounts open for these former employees. Meanwhile, those departed associates may go to other firms that also represent SSA clients and continue representing clients for the new firm. Likewise, newly hired associates at M&N may have previously worked for clients of other firms, having left their old jobs with fees pending. In both scenarios -- i.e., involving former M&N associates and newly hired M&N associates -- the SSA has erroneously credited past fees to the associates' current employers' tax ID numbers rather than to the tax ID numbers of the

---

cases often remain pending for several years, and young associates often change firms.").

As an example of how payment timing can affect M&N's access to fees, M&N's Statement of Uncontested Material Facts describes the submission of fee petitions in April 2018 by partner Nesselbush and associate Valerie Diaz for their joint representation of a successful claimant. The SSA hired Diaz in July 2018. The agency's decision on the fee award was issued in November 2018, and it rejected Diaz's petition because -- as required when she changed jobs -- she had withdrawn as counsel and "'waived the right to charge and collect a fee.'"

- 13 -

firm where the associates worked when the compensable work was performed. The SSA also has incorrectly credited payments for new representation work to the previous employer's tax ID number.[9] M&N alleges that this "quagmire" has required the annual hiring of an accountant "to straighten out the income and file corrected 1099's."

Relatedly, M&N points to the SSA rule that fees will not be paid from past-due benefits to an attorney who has withdrawn from a case "prior to a favorable decision." POMS § GN 03920.017.A. Hence, if a new M&N associate takes over representing a client from a departed associate while proceedings are ongoing, M&N would be able to collect fees for its former associate's work only from the client. See id. However, M&N reports "very limited success" in its attempts to collect fees from claimants. Compl. ¶ 93.[10]

---

[9] M&N's complaint gave a specific example of two associates who recently had been hired from another firm where they also had handled Social Security disability cases. Compl. ¶ 57. M&N reported that fees for the attorneys' pre-M&N cases were coming into M&N accounts and that fees related to the attorneys' work at M&N were being misdirected to the prior firm.

[10] The agency is aware of this difficulty. In testimony before a House committee in 2000, an SSA deputy associate commissioner stated that "[o]btaining payment from clients is often difficult for attorneys, who sometimes have to expend considerable resources to get paid." Attorney Fee Implementation: Hearing Before SubComm. on Social Security of the H. Comm. On Ways & Means, 106th Cong. (June 14, 2000), 2000 WL 799529. See also Gisbrecht, 535 U.S. at 804-05 & n.13 (noting that Congress authorized the payment of

- 14 -

### b. Moving to Government Employment

M&N describes as particularly "bizarre" the SSA's rules for fee payments when an attorney leaves the firm to work for the government. Compl. ¶ 60. The SSA requires attorneys who accept government employment to waive all fees that were not authorized before they started their government jobs. As a result, M&N has been unable to collect fees for work performed by such attorneys, even when all work in a case has been completed and a request for fees is pending with the SSA at the time the former associate enters government service.[11] M&N thus loses access to fees that the SSA -- through its handling of 1099s, as described above -- would have recognized as income to the firm. According to the SSA, fee waivers are required in these circumstances pursuant to federal laws that bar government employees from receiving compensation during their employment "for any representational

---

attorney's fees from past-due benefits to ensure that appropriate fees would be paid).

[11] The waiver requirement currently appears to affect only fees sought through the petition process for attorneys who leave for government work. In August 2017, the SSA implemented a new policy to exclude from the division of fees pursuant to an agreement any attorney who has waived his right to a fee. Hence, if a departed associate and an M&N partner work together on a case, and the associate waives his or her fee, it appears that the partner would be entitled to collect from the claimant's past-due benefits 100 percent of the amount specified in the fee agreement (if that amount otherwise meets SSA requirements). See POMS GN § 03920.050.D.2, D.2.c. (Ex. 4). The impact of the new policy is further discussed in Section III.C.2.b.

services . . . rendered" in agency proceedings affecting the interests of the United States. 18 U.S.C. § 203(a); see also id. § 205(a) (subjecting federal employees to penalties for undertaking such representation).

## 2. Specific Fee-Collecting Problems

M&N's complaint and Statement of Undisputed Facts contain detailed accounts of its efforts to obtain fee payments for work completed by three former associates who were hired by the SSA in 2015: Joseph Wilson, Paul Dorsey, and Kyle Posey. At the time the three attorneys left M&N, the SSA had not yet authorized fees for some cases on which they had worked. In some instances, fee petitions had been submitted, but not yet acted upon; in other cases, the representation work had been completed, but the benefits decision had not yet been issued; and in other cases, M&N attorneys continued to represent claimants who previously had been represented by Wilson, Dorsey, or Posey. Compl. ¶¶ 51-55. In due course, M&N sought fees for the three associates' work in each of these cases.[12]

In response to its inquiries, M&N was told by defendant Tara Collins, a supervisor for the SSA's Office of Hearing

---

[12] In its Statement of Undisputed Facts, M&N reported similar problems in obtaining attorney's fees for representative services provided by two other M&N associates, Jennifer Belanger and Valerie Diaz, who were hired by the SSA in July 2018.

Operations ("OHO") in Lawrence, Massachusetts,[13] that the former associates were required to waive pending fees in their cases because of "[t]he criminal ethics statute at issue, 18 U.S.C. § 203."[14] Collins also told M&N that the firm was not entitled to the former associates' portion of the fees from cases those associates worked on with M&N partners.[15] M&N partner Nesselbush then asked Collins for guidance on how to collect those fees, noting that the associates had already been paid "for their work . . . represent[ing] our clients." The answer, simply, was that M&N could not collect the fees directly from the SSA. Defendant Carolyn Tedino, the Regional Management Officer for the SSA in Boston, explained in a letter that the "SSA will not authorize to any co-representative the share of a co-representative who waived a fee. SSA releases the waived share to the claimant(s)." In other words, even though an M&N partner is listed as a co-representative on its former associates' appointment forms,

---

[13] This office previously was known as the Office of Disability Adjudication and Review ("ODAR").

[14] Although Collins's email message applied only to the two attorneys she supervised at the office in Lawrence -- Wilson and Dorsey -- the substance she conveyed applied to all three former M&N associates. The third attorney, Kyle Posey, was hired by the SSA to work in its Boston Regional Office. Compl. ¶ 73.

[15] In email messages that Dorsey and Wilson subsequently sent to M&N, they reported that they had been told that "'[t]he simple act of receiving and endorsing a check over to the contracting firm could constitute seeking, receiving, and/or agreeing to receive fees in violation of § 203.'"

neither the partner nor the firm could be paid, from the past-due benefits, the fees attributable to the associates' specific work.

M&N nonetheless persisted in asking that the fees earned by Wilson, Dorsey, and Posey be paid in the name of M&N or in the name of the partner listed as the main representative in each of their cases. In some instances -- presumably in error, given the agency's position -- the SSA paid fees in the individual attorney's name and deposited them into the departed attorney's M&N bank account. However, because Wilson and Dorsey had revoked their M&N powers of attorney, at the SSA's insistence, for fees that were not yet authorized when they began their government jobs, the firm converted the former associates' M&N accounts into escrow accounts instead of transferring the funds into its operating account.[16]

In other instances, the SSA denied fees for work performed by M&N's former associates. For example, Nesselbush submitted a fee petition in early 2016 seeking $25,456.50 for work she and Posey performed for a claimant. An administrative law judge authorized payment of $19,092.50 for Nesselbush's services, but rejected fees for the 53.20 hours of work performed by Posey. The SSA subsequently affirmed the exclusion of fees for Posey's

_____

[16] In its Statement of Undisputed Material Facts, M&N reported that certain fees paid to associates in 2015, after they began government work, remain "stuck in an escrow account."

work, advising Nesselbush that no further review was available. The result was similar when Marasco submitted a fee petition seeking $6,000 in fees for work he and Dorsey performed on behalf of another disability claimant. The SSA authorized a $2,000 fee for Marasco, specifically excluding Dorsey's work from its consideration. In a decision upholding that amount, an administrative law judge noted that the objections Marasco raised to the SSA's fee policies were "outside the scope of [his] review and therefore [would] not be addressed in [his] Order."

At the time M&N filed its amended complaint, in December 2017, the firm estimated that the disputed attorney's fees at issue in this case totaled approximately $50,000. Compl. ¶ 99. Three years later, at oral argument in this appeal, M&N stated that about $70,000 in fees were at issue for work performed by associates who left the firm for government employment, including $15,000 held in escrow.

## D. Other Law Firms

M&N alleged in its complaint that other law firms in Rhode Island had not experienced the same difficulties in receiving payment from the SSA for work performed by associates who left for government service. According to M&N, two such firms used a similar approach of paying associate attorneys by salary, with all fees generated in the individual names of the associates therefore viewed by the firms as their property. M&N alleged that the SSA

"routinely paid the attorney's fees without incident" for former associates of these firms "who, at the time of payment, worked at the SSA."  Compl. ¶ 106.

## II.

### A. Nature of the Action

M&N filed this lawsuit against the SSA and several agency officials, including Collins and Tedino, and former M&N associates Wilson, Dorsey, and Posey.[17]  The firm's fifty-six-page First Amended Complaint alleges that the SSA's "byzantine and irrational rules" on attorney's fees "discourage law firms from practicing in the field of Social Security disability law and thereby diminish the payment of disability benefits to deserving claimants."  Compl. at 1-2.  Taken together, the complaint's ten counts reflect M&N's contention that it has been denied its right to tens of thousands of dollars in attorney's fees by arbitrary and capricious SSA rules that the agency adopted unlawfully.  Among its requests for relief, the firm seeks a writ of mandamus requiring the SSA to authorize M&N's receipt of fees for work performed on its behalf by Wilson, Dorsey, and Posey, and a declaratory judgment that, inter alia, (1) the SSA must authorize payment of attorney's fees to M&N for

---

[17] The parties stipulated to dismissal of claims brought against the agency officials in their individual capacities and against the former associates, and those claims are therefore not at issue in this appeal.

an associate's work when the associate leaves the firm, (2) M&N must receive attorney's fees disbursements from the SSA in its own name, and (3) the POMS and HALLEX attorney's fees provisions cited in the complaint are void because they were not adopted through the APA's notice-and-comment provisions.

## B. The District Court's Opinions

The defendants moved to dismiss the complaint and, in July 2018, the district court dismissed M&N's mandamus (Count IV) and APA claims (Counts VIII and IX).[18] The court held that sovereign immunity bars any claim for mandamus that seeks payment of fees, see Marasco & Nesselbush, LLP v. Collins ("M&N I"), 327 F. Supp. 3d 388, 393 (D.R.I. 2018), and it concluded that the firm's challenges to the agency's fee-paying procedures were statutorily barred because the rules qualify as "action . . . committed to agency discretion by law," id. at 396 (quoting 5 U.S.C. § 701(a)(2)).

However, the court found that M&N had adequately pled its constitutional claims (Counts V, VI, and VII). With respect to procedural due process, the court held that M&N had properly asserted a protected property interest in the disputed attorney's

---

[18] As noted above, the parties agreed to dismiss the claims against Dorsey, Wilson, and Posey, as well as the claims against the SSA defendants as individuals. See Marasco & Nesselbush, LLP v. Collins, 327 F. Supp. 3d 388, 393 & n.3 (D.R.I. 2018). The court's 2018 decision covered the remaining six claims.

fees and plausibly alleged that the defendants had interfered with that interest by "provid[ing] no process at all" for obtaining the fees. Id. at 394. On the substantive due process claim, the court ruled that "a rational finder of fact could conclude that SSA's actions were arbitrary and/or irrational." Id. The court noted various rules that could be found irrational, including "that SSA recognizes law firms for tax purposes but not for attorney['s] fees" and "that attorneys who leave M&N to work for SSA are not paid." Id. Finally, concerning equal protection, the court noted that M&N had sufficiently stated a claim for two types of harm: that the SSA singled out M&N for adverse treatment relative to other law firms -- a so-called "class of one" claim -- and that the SSA irrationally discriminated against M&N "based on its status as a law firm as compared to SSA's treatment of individual attorneys." Id. at 395.

In March 2020, after both parties moved for summary judgment on the three remaining claims, the district court granted the SSA's motion and denied M&N's motion. The court concluded that "M&N's procedural due process claim fails because M&N does not have a property interest in representative attorney's fees authorized by the SSA." Marasco & Nesselbush, LLP v. Collins ("M&N II"), 444 F. Supp. 3d 317, 326 (D.R.I. 2020). That is so, the court explained, because the SSA "made a reasonable choice within the statutory grant of its authority" "not to recognize entities

- 22 -

like M&N as representatives." Id. Nor do the agreements between M&N and its associates give the firm a protectible property interest, the court explained, because the SSA has complete discretion to grant or deny a fee request and a violation of procedural due process requires "more than a 'unilateral expectation' of a property interest." Id. at 327 (quoting Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005)).

On the substantive due process claim, the court held that M&N had not shown that the SSA's framework for disbursing attorney's fees lacked a rational basis. Noting the agency's assertion that recognizing only individuals as representatives allowed efficient management and oversight of the benefits process, the court observed that the question for rational basis review is not whether the agency chose "'the best means to accomplish' its purpose." Id. at 329 (quoting Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 316 (1976)). Accordingly, M&N's evidence suggesting that it "would be no more difficult" to meet the agency's objectives if law firms served as representatives was insufficient to dispel the rationality of the SSA's choice. Id. at 328-29.

The court held that the same failure to show the irrationality of the SSA framework doomed M&N's equal protection claim based on the agency's discrimination against law firms. Id. at 331-32. The court also rejected the "class of one" claim,

finding that the claim required evidence of bad faith or malicious intent and that M&N had not presented such evidence. Id. at 330-31.

On appeal, M&N challenges the rulings on each of the six claims addressed by the district court. Although certain of M&N's contentions appear to take issue with the SSA's refusal to recognize law firms as representatives -- in addition to challenging the agency's fees-payment procedures -- M&N clarified at oral argument that it is targeting only the latter. We, accordingly, consider M&N's claims only insofar as they challenge rules on obtaining payment of fees.

**III.**

We address in this section M&N's assertions of error in the district court's dismissal of its causes of action for mandamus (Count IV) and violation of the APA (Counts VIII and IX).

**A. Standard of Review**

The SSA moved to dismiss M&N's complaint based on both Rule 12(b)(1), for lack of subject-matter jurisdiction, and Rule 12(b)(6), for failure to state a claim. The district court did not specify the rule on which it relied to dismiss the three counts, and we similarly need not distinguish between them. A court's inquiry is largely the same under both rules: the well-pleaded facts must be taken as true and viewed in the light most favorable to the plaintiff, and all reasonable inferences from

those facts must be drawn in the plaintiff's favor. See Lyman v. Baker, 954 F.3d 351, 359-60 (1st Cir. 2020) (noting that "the same basic principles apply in both situations," although the inquiries under the two rules are "conceptually distinct" (quoting Hochendoner v. Genzyme Corp., 823 F.3d 724, 730-31 (1st Cir. 2016))).[19] We review dismissals granted under both rules de novo, see In re Fin. Oversight & Mgmt. Bd. for P.R., 919 F.3d 638, 644 (1st Cir. 2019), as we do "the question of whether a claim is justiciable under the APA," Union of Concerned Scientists v. Wheeler, 954 F.3d 11, 16 (1st Cir. 2020).

As we explain below, however, we have chosen to go beyond the question of dismissal on M&N's arbitrary-and-capricious APA claim based on the undisputed portions of the record developed in support of the parties' motions for summary judgment. From that perspective, too, our review is de novo. See Shurtleff v. City of Bos., 986 F.3d 78, 85 (1st Cir. 2021). We may grant judgment only "when the record demonstrates that there is no genuine issue as to any material fact and confirms that the movants are entitled to

---

[19] A key difference is that, if a Rule 12(b)(1) motion contests factual allegations of the complaint, the court must engage in judicial factfinding to resolve the merits of the jurisdictional claim. See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363-65 (1st Cir. 2001). Rule 12(b)(6) motions, on the other hand, are always facial, not factual, challenges to the complaint. Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth., No. 20-1096, 2021 WL 2699040, at *3 (July 1, 2021).

judgment as a matter of law." Id. (noting that the same standard applies to cross-motions for summary judgment).

**B. Mandamus**

The district court dismissed M&N's mandamus count on the ground that sovereign immunity bars the claim. In support of its ruling, the court cited cases in which attorneys sought fees payments from the SSA itself. See M&N I, 327 F. Supp. 3d at 393. On appeal, the SSA defends the court's decision by arguing that M&N may not "compel" the SSA to pay attorney's fees through the mandamus process. M&N, however, is not seeking a monetary remedy from the SSA itself. Rather, its mandamus count seeks to compel the SSA to release the fees already in M&N's possession for work performed by its former associates now working for the agency and to authorize other fees for work performed by those attorneys while they were employed by the firm.

The Supreme Court has on multiple occasions expressly refrained from deciding whether the review provisions of the Social Security Act bar a mandamus claim against the SSA under 28 U.S.C. § 1361.[20] See, e.g., Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 456 n.3 (1999). We have not previously

---

[20] Section 1361 grants jurisdiction to district courts over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

decided the question, although we long ago observed that mandamus relief "might be available in those extreme situations where no other remedy was available." Matos v. Sec'y of Health, Educ. & Welfare, 581 F.2d 282, 286 n.6 (1st Cir. 1978).[21]

We again have no occasion to decide the issue. Even if permitted, mandamus relief is unavailable here because, as explained below, M&N has another avenue for obtaining relief. "A writ of mandamus is an extraordinary remedy that is available only when certain conditions are met," In re Fin. Oversight & Mgmt. Bd. for P.R., 985 F.3d 122, 127 (1st Cir. 2021), including that a party has "exhausted all other avenues of relief," Heckler v. Ringer, 466 U.S. 602, 616 (1984). We therefore affirm dismissal of M&N's mandamus cause of action.

## C. The Administrative Procedure Act

M&N presses two different APA claims: a contention that the agency improperly adopted portions of its attorney's fees framework without the required notice-and-comment procedures and a challenge to aspects of that framework as arbitrary and capricious. We consider each in turn.

---

[21] Most other circuits have concluded that mandamus jurisdiction is available "to review otherwise unreviewable procedural issues" arising under the SSA. Family Rehab., Inc. v. Azar, 886 F.3d 496, 505 & n.21 (5th Cir. 2018) (quoting Wolcott v. Sebelius, 635 F.3d 757, 764 (5th Cir. 2011)); see also Wolcott, 635 F.3d at 765 (collecting cases).

## 1. The Notice and Comment Requirement

M&N claims that the SSA violated the APA by adopting its rules on the payment of fees without adhering to the notice and comment requirements that apply to an agency's "substantive rules of general applicability."  5 U.S.C. § 552(a)(1)(D); see also id. § 553; N.H. Hosp. Ass'n v. Azar, 887 F.3d 62, 70 (1st Cir. 2018) (noting that "[f]ailure to abide by the[] [notice and comment] requirements renders a rule procedurally invalid").[22]  Although the district court dismissed this challenge along with the APA arbitrary-and-capricious claim based on "the breadth of discretion afforded to [the] SSA" on matters related to the representation of claimants, M&N I, 327 F. Supp. 3d at 397, the notice and comment process is a statutory obligation that does not depend on the scope of the agency's discretion.  A rule subject to notice-and-comment procedures "cannot stand" if the process was not followed, unless a "lawful excuse" exists for neglecting that statutory obligation. Azar v. Allina Health Servs., 139 S. Ct. 1804, 1808 (2019).  To that end, we proceed to assess the merits of M&N's notice and comment claim because we disagree with the district court that it is unreviewable.

---

[22] "The APA generally requires that before a federal agency adopts a rule it must first publish the proposed rule in the Federal Register and provide interested parties with an opportunity to submit comments and information concerning the proposal."  N.H. Hosp. Ass'n, 887 F.3d at 70 (citing 5 U.S.C. § 553).

M&N correctly points out that "the vast majority" of the provisions governing disbursement of attorney's fees appear only in the HALLEX and POMS manuals and were adopted without public notice and comment. In response, the SSA asserts that the manuals contain "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice" and, as such, are exempt from notice-and-comment procedures. 5 U.S.C. § 553(b)(A).

In our view, the fees-paying procedures that appear in the POMS and HALLEX guides -- at least for the most part -- either reiterate requirements that appear in regulations that did go through the notice-and-comment process or consist of elaborations that are fairly characterized as "rules of agency organization, procedure or practice" exempt from that process. As noted, the governing statute directs the Commissioner to pay a "reasonable fee" to "an attorney" so as "to compensate such attorney for the services performed." 42 U.S.C. § 406(a)(1). The regulations specify, inter alia, that the agency determines "the amount of the fee, if any, a representative may charge or receive," 20 C.F.R. § 404.1720(b)(2); the content of the required written request for approval of a fee, id. § 404.1725(a); the factors the agency will consider in evaluating such a request, id. § 404.1725(b); and the limits for payments the agency will make from claimants' past-due benefits, id. § 404.1730(b).

In other words, these regulations, together with § 406, create the entitlement and parameters for the fees, the details of which, including payment procedures, are set forth in the HALLEX and POMS manuals. The interpretive rules therefore do not "create[] rights, assign[] duties, or impose[] obligations, the basic tenor of which is not already outlined in the law itself." N.H. Hosp. Ass'n, 887 F.3d at 70 (quoting La Casa Del Convaleciente v. Sullivan, 965 F.2d 1175, 1178 (1st Cir. 1992)); see also Powderly v. Schweiker, 704 F.2d 1092, 1098 (9th Cir. 1983) (noting that interpretive rules "do not change any existing law or policy nor do these provisions remove any previously existing rights"). Rather, the challenged provisions "merely . . . advise the public of the agency's construction of the statutes and rules which it administers." N.H. Hosp. Ass'n, 887 F.3d at 70 (quoting Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 97 (2015)) (internal quotation marks omitted); see also Powderly, 704 F.2d at 1098 (noting that interpretive rules "only explain what the more general terms of the Act and regulations already provide").

The rule specifying that approved fees may be released only to individuals -- though consequential -- does not affect either eligibility for a fee or the amounts authorized; it merely prescribes how approved fees are to be disbursed. As such, we view it as administrative rather than substantive. See N.H. Hosp. Ass'n, 887 F.3d at 74 (distinguishing "interstitial, minor, or

confirmatory pronouncements guiding agency operation[s]" from "a new policy" that impacted the amount of Medicaid reimbursements to hospitals). Importantly, even if the rule is not subject to the notice-and-comment process, it is subject to review under the arbitrary and capricious standard -- as applied below. See Perez, 575 U.S. at 105-106.

The SSA's ability to adjust certain mechanics of its fees-paying framework without engaging in the notice-and-comment process enables the agency to respond nimbly to flaws that become apparent with experience -- for example, by making the modification described above in the agency's handling of fee agreements when one co-representative waives his or her share of the agreed-upon amount. See supra note 11.[23] Of course, whether the SSA properly uses that flexibility -- or fails in some instances to do so, see infra -- is irrelevant in assessing whether a challenged rule is sufficiently substantive to require notice-and-comment procedures. Here, we are satisfied that the individual-only disbursement rule goes primarily to methodology, not substance.

A closer question is presented by the SSA's rule barring payment of fees for work completed by attorneys before they depart

---

[23] In all likelihood, the prior rule could not have withstood arbitrary-and-capricious review. Among other factors, it would be difficult to defend a rule that eliminates as much as one-half of an agreed-upon fees payment without regard for the role played by each attorney.

for government service if those fees were not yet authorized when they changed jobs. That rule does impact the entitlement to fees and, at times, appears to operate at odds with the statutory command to pay attorneys a reasonable fee for successful representation. See 42 U.S.C. § 406(a)(1) (providing for "a reasonable fee" "whenever the Commissioner of Social Security . . . makes a determination favorable to the claimant"). On the other hand, this rule, too, might be viewed as simply an administrative mechanism for implementing the statutory fees mandate consistently with other federal laws. See 18 U.S.C. § 203(a) (barring government employees from receiving fees for representing a party against the government). Ultimately, we choose to bypass the question whether the government-attorney rule is procedurally unsound because, as explained below, we conclude that it is arbitrary and, for that reason, unenforceable.

M&N has not identified specific rules beyond those that we have discussed that are still in place and warrant notice-and-comment treatment.[24] Accordingly, we conclude that the SSA was not required to engage in the notice-and-comment rulemaking process

---

[24] M&N complains, for example, about the requirement that all representatives must sign the same fee agreement. Not only does this rule plainly fall outside the notice-and-comment requirement, but it also easily survives arbitrary-and-capricious review. Requiring a single document is a rational way to avoid confusion about how many representatives are entitled to share in the fees authorized pursuant to an agreement.

for the rule specifying that fee payments may be disbursed only to individual representatives for the work they performed. As explained above, we do not consider whether the agency should have gone through that process for the rule barring certain payments to attorneys hired by the government.

## 2. Arbitrary and Capricious Review

### a. Reviewability

Under the APA, agency action may not be challenged in court if judicial review is precluded by statute, 5 U.S.C. § 701(a)(1), or if the disputed action "is committed to agency discretion by law," id. § 701(a)(2). When judicial review is permitted, the court may, inter alia, "compel agency action unlawfully withheld or unreasonably delayed" and set aside agency action that is "arbitrary, capricious, [or] an abuse of discretion." Id. § 706(1), (2)(A). The district court concluded that § 701(a)(2) applies here, and it dismissed M&N's APA claims on the ground that Congress gave the SSA broad discretion to "prescribe rules and regulations governing the recognition of agents . . . representing claimants before the Commissioner of Social Security." M&N I, 327 F. Supp. 3d at 396-97 (quoting 42 U.S.C. § 406(a)(1)).

Even when an agency is afforded broad discretion, however, that authority is rarely absolute. We recently observed that "[t]here is a 'strong presumption' of judicial review under

- 33 -

the APA." Union of Concerned Scientists, 954 F.3d at 17 (quoting Mach Mining, LLC v. EEOC, 575 U.S. 480, 486 (2015)); see also Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 139 S. Ct. 361, 370 (2018) ("A court could never determine that an agency abused its discretion if all matters committed to agency discretion were unreviewable."). The Supreme Court has described the exception to the presumption of reviewability for agency action as "quite narrow[], restrict[ed] . . . to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Dep't of Commerce v. New York, 139 S. Ct. 2551, 2568 (2019) (quoting Weyerhaeuser Co., 139 S. Ct. at 370). The Court gave as examples of such circumstances "a decision not to institute enforcement proceedings or a decision by an intelligence agency to terminate an employee in the interests of national security." Id. (citation omitted).

The practices challenged here as arbitrary and capricious are far different from the traditionally discretionary judgments highlighted by the Supreme Court. Indeed, M&N's complaints do not relate to the agency's decisions on benefits eligibility -- the core of the SSA's discretionary responsibility and authority -- or even to decisions on the appropriate amount of attorney's fees for the work performed in individual benefits cases. Rather, M&N challenges general rules that it claims prevent

- 34 -

or unreasonably complicate the collection of reasonable fees that it should be paid for work performed, in effect, by the firm.

To be specific about the nature of that challenge, we reiterate that M&N is not objecting to the SSA's rule barring law firms from serving as claimants' representatives. Rather, our focus is solely on certain rules governing fees payments for the work of individual attorneys. On that issue, we have identified two practices that M&N challenges: (1) the refusal to authorize attorney's fees attributable to the work of attorneys who left private practice for government jobs if those fees were not approved before the attorneys' departures and (2) the refusal to pay fees from past-due benefits to law firms on behalf of their salaried associates.[25]

We see no barrier to judicial review of these challenges. As described above, the SSA asserts that the prohibition against paying fees to newly hired government employees is required by the statutes barring federal employees from receiving compensation for work performed in actions against the government, see 18 U.S.C. § 203, and from serving as attorneys in any such actions, see id. § 205. The judgment on whether a fees payment would conflict with

_____

[25] M&N also challenges as arbitrary the payment of attorney's fees to other law firms in circumstances in which M&N has been denied payments. We take up M&N's allegations concerning differential treatment of law firms below, in our discussion of its equal protection claims.

federal ethics laws does not implicate the agency's substantive authority over the Social Security system and, hence, is not "peculiarly within [the SSA's] expertise." Union of Concerned Scientists, 954 F.3d at 18 (quoting Lincoln v. Vigil, 508 U.S. 182, 191 (1993)). Nor is the scope of the federal ethics laws "an area so traditionally left to [SSA] discretion as to constitute an exception to the normal rule of justiciability." Id.

In addition, M&N asserts that the agency's refusal to make direct payments to law firms for their salaried associates' representation of SSA claimants improperly interferes with the collection of the "reasonable fee" that, pursuant to statute, the SSA must pay for services provided in connection with successful benefits claims. See 42 U.S.C. § 406. We think it self-evident that courts are well equipped to judge whether rules limiting to whom attorney's fees are payable improperly deny the "reasonable fee" mandated by § 406(a)(1). As with the ethics-related rule, the payment mechanisms are collateral to the SSA's discretion to manage the complex benefits system created by the Social Security Act. See generally Schweiker v. Gray Panthers, 453 U.S. 34, 43 (1981) (noting "the exceptionally broad authority" conferred on the SSA "to prescribe standards for applying certain sections of the Act" (emphasis added)). We are thus persuaded that the agency's rules on the permissible methods for paying authorized

fees also are subject to "the normal rule of justiciability." Union of Concerned Scientists, 954 F.3d at 18.[26]

Accordingly, the district court erred in concluding that the APA forecloses M&N's claim challenging certain of the SSA's payment rules as arbitrary and capricious. We could, at this juncture, simply remand the case to the district court for consideration of that claim. However, the parties litigated the rationality of the challenged rules on the merits in the context of their cross-motions for summary judgment on M&N's constitutional claims, and the parties have therefore developed the record and presented their legal and factual arguments on that issue. Accordingly, we think it appropriate to consider ourselves whether the challenged rules survive arbitrary-and-capricious review under the APA. Moreover, as explained below, doing so is consistent with our obligation to avoid unnecessary constitutional decisions.

---

[26] In Union of Concerned Scientists, we noted the need for a "set of statutory or regulatory requirements to guide us in assessing the propriety of an agency's procedures" apart from "the reasoned decision-making standards of the APA alone." 954 F.3d at 21. With Congress's objectives as reflected in § 406(a)(1) -- to pay attorneys representing SSA claimants "a reasonable fee" -- and in 18 U.S.C. §§ 203 and 205 -- barring government employees from compensation and representation in cases against the United States -- federal courts have ample basis and guidance to evaluate the rules challenged here.

In turning to that evaluation, we begin by noting that, notwithstanding the preference for judicial review of agency action, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow[,] and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Nonetheless, an agency rule ordinarily will not survive

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Id.; see also Dep't of Homeland Sec. v. Regents of Univ. of Calif., 140 S. Ct. 1891, 1905 (2020) (noting that the APA "requires agencies to engage in 'reasoned decisionmaking'" (quoting Michigan v. EPA, 576 U.S. 743, 750 (2015))). Pursuant to this "'highly deferential'" standard of review, courts should uphold an agency determination if it is "supported by any rational view of the record." Atieh v. Riordan, 797 F.3d 135, 138 (1st Cir. 2015) (quoting River Street Donuts, LLC v. Napolitano, 558 F.3d 11, 114 (1st Cir. 2009)). From that perspective, we turn to the two rules we have identified.

## b. Former Associates in Government Positions

On appeal, the SSA offers little justification for the rule barring payments to attorneys whose fees were not approved before their move to government employment.[27]  It cursorily asserts that "[g]overnment-wide ethics statutes preclude SSA officers and employees from representing claimants and receiving compensation for such representation before the agency," citing 18 U.S.C. §§ 203(a)(1) and 205(a)(2).  Section 203(a) addresses the receipt of compensation by government employees and states, in relevant part, that an individual will be subject to penalties if he or she

> (1) demands, seeks, receives, accepts, or agrees to receive or accept any compensation for any representational services, as agent or attorney or otherwise, rendered or to be rendered either personally or by another--
> . . .

---

[27] It appears that this prohibition is not explicitly set forth in either the POMS or HALLEX manuals, except insofar as the manuals specify that individuals must submit their own fee requests and that payments may be made only to individuals.  Rather, the rule arises from the SSA's practice of requiring fee waivers for new government employees with pending fee requests.  In its brief to this court, the SSA cited as support for the practice -- in addition to the two ethics statutes discussed above -- two sections of a regulation titled "Rules of conduct and standards of responsibility for representatives."  20 C.F.R. § 404.1740.  One cited section, (b)(3)(iv), states, inter alia, that representatives have a duty to "[o]nly withdraw representation at a time and in a manner that does not disrupt the processing or adjudication of a claim."  The other section, (b)(8), requires representatives to disclose to the agency when they "ha[ve] been disqualified from participating in or appearing before any Federal program or agency."  Neither provision addresses the obligation to forgo fees.

> (B) at a time when such person is an
> . . . employee . . . in any agency of the
> United States.

18 U.S.C. § 203(a)(1) (emphasis added). Section 205 contains a similar prohibition, but it covers the representation work itself rather than compensation for such work. See 18 U.S.C. § 205(a)(2).

The SSA does not explain to us how a statute that by its terms bars compensation to attorneys for "representational services . . . rendered . . . at a time" when they are working for the government supports its prohibition on fees for work completed before that employment began. However, in 2015, in response to M&N's inquiry about fees due for work performed by Wilson and Dorsey, defendant Tara Collins relied on a 1998 opinion from the federal Office of Legal Counsel ("OLC") to elaborate on why the fees could not be paid. The opinion reports that the OLC has long viewed § 203 to "prohibit[] an individual entering government employment from maintaining a contingent interest in fees recoverable in a proceeding involving the United States." Application of 18 U.S.C. § 203 to Maintenance of Contingent Interest in Expenses Recoverable in Litigation Against the United States, 22 Op. O.L.C. 1, 2 (1998). Collins specifically invoked a sentence contained in a footnote attached to that quoted statement: "A rule against retaining a contingent interest in fees reflects that a contingent fee covers the entire representation up to the payment, the amount remains uncertain until then, and the

fee thus compensates, in part, for representational services performed after the employee began working for the United States." Id. at 2 n.2.

Even with that elaboration drawn from the record, however, we find the SSA's reasoning to be inscrutable at best and, given the information available to the agency, facially irrational. Through the fee petition process, an attorney "request[s] a fee for the services he or she actually provided." HALLEX § I-1-2-53.A (emphasis added). Importantly, the information required in a fee petition includes "[t]he dates services began and ended." POMS § GN 03930.020.D.3; see also 20 C.F.R. § 404.1725(a)(1). The fee petition process itself thus allows the agency to confirm that the work underlying the fee request was performed before an attorney's government employment began. Fees awarded through this process are not properly labeled "contingent." As we have described, the statute governing SSA representation, § 406, mandates "a reasonable fee" for the services performed by an attorney who successfully represents a claimant, and fees also may be requested via petition if no benefits are awarded. Hence, even though the exact amount remains within the SSA's discretion, based on the factors prescribed in its rules, the petition procedures set forth a fee-for-service model that easily permits the SSA to determine a reasonable fee without running afoul of the ethics requirements -- and which § 406(a)

requires it to do for successful representation. See generally Weisbrod v. Sullivan, 875 F.2d 526, 528 (5th Cir. 1989) (noting that both the governing statute, 42 U.S.C. § 406, and the regulation listing the factors for determining an award, 20 C.F.R. § 404.1725(b), "appear to be aimed at ensuring that an attorney receives a fair fee for the work he or she performs while at the same time not unduly dissipating the claimant's benefits"); see also Gisbrecht, 535 U.S. at 805 (similar).

In fact, the SSA framework expressly references contingency fees as a distinct payment arrangement, recognizing that a "representative and claimant [may] enter[] into a contingency contract." HALLEX § I-1-2-57.A.6; see also POMS § GN 03930.020.A.[28] When such an agreement is made, and the agency

---

[28] At least in the past, contingency-fee contracts were widely used in SSA benefits cases. In Gisbrecht, the Supreme Court cited a 1988 SSA report for its observation that "[s]uch contracts are the most common fee arrangement between attorneys and Social Security claimants." 535 U.S. at 800; see also id. at 804 ("Traditionally and today, 'the marketplace for Social Security representation operates largely on a contingency fee basis.'" (citing the same SSA report)). Although Gisbrecht was reporting on agreements for representation in court, Congress anticipated that the "streamlined process" of fee agreements -- adopted later for administrative representation -- would be similarly popular in that context and "generally replace the fee petition process." Power v. Barnhart, 292 F.3d 781, 786 (D.C. Cir. 2002) (quoting H.R. Conf. Rep. No. 101-964, at 933 (1990)) (emphasis omitted). More recent SSA data shows that fee petitions did decrease in popularity, with the percentage of fees paid from withheld benefits pursuant to that process steadily declining from about 30 percent in 1995 to roughly 12 percent in 2000. See SSA's Processing of Attorney Fees: Hearing Before Subcomm. on Social Security of the

denies the benefits claim, the SSA will not authorize a "<u>fee for services</u> if the representative petitions." HALLEX § I-1-2-57.A.6 (emphasis added); <u>see also id.</u> § I-1-2-51 (stating that, "[u]nder the fee petition process, each representative who wants to charge and collect <u>a fee for his or her services</u>, must file a fee petition" (emphasis added)); POMS § GN 03930.020.A (stating that "any representative may request <u>a fee for the services he or she actually provided</u> . . . using the fee petition process," except, inter alia, where the representative had a contingency fee contract and benefits were denied (emphasis added)).

In other words, the SSA itself views contingency fees and the fees paid via the petition process "for the services . . . actually provided" as two different forms of payment.[29] For the

---

<u>H. Comm. on Ways & Means</u>, 107th Cong. (May 17, 2001). The record does not reveal the current popularity of fee agreements.

[29] The SSA's rules also contemplate other fee arrangements. For example, the agency recognizes that a representative and claimant may agree to rely on "the fee agreement process, if SSA favorably decides the claim at a certain level," but will rely on "the fee petition process, if the claim progresses beyond the level specified in the agreement." POMS § GN 03920.001.C.2 ("Two-tiered Arrangement"). The SSA similarly recognizes that the claimant and representative may sign a non-contingent fee agreement, in which the claimant's lack of success would mean that the representative could not obtain a fee based on the statutory provision regarding agreements. <u>See</u> 42 U.S.C. § 406(a)(2). However, if the agreement was not "a contingency fee contract," the representative could nonetheless submit a fee petition after his or her representation ends. <u>See</u> POMS § GN 03930.020.A; HALLEX § I-1-2-51; <u>id.</u> § I-1-2-53.A; <u>id.</u> § I-1-2-57.A.6 (Exception).

latter, fee payments would violate § 203 only if they were for "representational services performed after the employee began working for the United States." 22 Op. O.L.C. at 2 n.2. We thus see no justification for rejecting fees for services that the SSA can readily determine were completed before the associate attorneys changed employers.

It may be that the SSA is reading the temporal element of § 203 -- referencing the time when a person is a government employee -- to apply not only to when "representational services" were "rendered," but also to when the employee receives compensation for those services. But the SSA offers no support for that reading of the statute, and the OLC legal guidance -- in the opinion invoked by the SSA itself -- is unequivocally to the contrary. In discussing § 203, the OLC stated that the provision applies when an employee "receive[s] something of value in exchange for the representational services <u>performed</u> on the client's behalf <u>during the officer's or employee's government tenure</u>." 22 Op. O.L.C. at 3 (emphasis omitted and added). In addition, in its examination of the statute's legislative history and underlying policies, the OLC noted that § 203 -- enacted in 1962 when Congress revised various ethics provisions -- "differed from its predecessor . . . principally in targeting payments for representational services performed on behalf of a client <u>during an employee's government tenure</u> (without regard for the timing of

the payment), rather than targeting payments received during an employee's government tenure (without regard for the timing of the services)." Id. at 4-5 (emphasis added). The OLC noted that § 203 "corrected one of" the "perceived defects" in the predecessor provision -- "namely, its coverage of payments for services wholly completed prior to the employee's entry into government service." Id. at 7 & n.7.

The OLC opinion also cautioned that, because a violation of § 203 can trigger criminal penalties, the statute should not be construed to extend more broadly "than that clearly warranted by the text." Id. at 4 (quoting Crandon v. United States, 494 U.S. 152, 160 (1990)); see also id. at 9 (stating that "the possibility of administrative difficulties cannot compel an interpretation of § 203 that would criminalize more conduct than that which the statutory text clearly reaches"). That well-known principle of statutory construction further undermines the agency's reliance on § 203 to deny attorney's fees for representative services performed before attorneys begin working for the government.

In sum, when fees sought through the SSA's petition process would not be for representation services that "remained to be performed after the [attorneys'] entry into government service," § 203 presents no barrier to the payments. Id. at 7. The same is true, of course, for fees payable under fee agreements when the representation is both complete and successful, and only

the agency's approval of the fee is pending. See POMS § GN 03910.060.B (noting that representation ends, inter alia, when the SSA "complete[s] all actions on a pending claim, matter, or issue and no appeal is filed within the appeal period"). As we understand the current rule regarding fee agreements, however, the SSA does not prevent firms with procedures like M&N's from obtaining the full agreement amount regardless of the stage of the proceedings. That is, if an associate departing for government work waives his or her fees, the co-representatives would become eligible to receive the full amount specified in the agreement from the claimant's past-due benefits even if the departing attorney "withdrew from the case before [the] SSA favorably decided the claim." HALLEX § I-1-2-12.B.2. As noted above, an M&N partner is always a co-representative for SSA cases taken by the firm.

We therefore conclude that the SSA's practice of denying fees for representation work that was completed before attorneys began government service is arbitrary for fees requested via the petition process and, to the extent applicable, for fees specified in an agreement. Moreover, where the representation is successful, denying such fees is inconsistent with § 406's directive to pay the claimant's attorney a reasonable fee. Nor has the SSA offered any rationale for refusing to pay such fees directly from claimants' past-due benefits, subject to the statutory limit on

the amounts payable and consistent with otherwise applicable rules.[30]

### c. The Payment Process

The SSA insists that fee payments processed by the agency from claimants' withheld benefits may be directed only to individual attorneys. As it did in the district court, the SSA defends this rule by invoking its reasons for limiting representative status to individuals. The SSA asserts that, because only representatives are entitled to attorney's fees, its reasonable choice to limit representation to individuals necessarily makes reasonable the rules foreclosing payments directly to M&N. In considering the rationality of the rule, the district court similarly focused on the agency's choice to limit

---

[30] In its brief, the SSA suggests a variety of measures that law firms could adopt to avoid fee-collection problems when associates plan to leave the firm for government work, including requesting that the departing attorneys provide sufficient notice to "wrap up their cases and fee requests prior to departure" and arrange start dates for their new jobs "that substantially prejudice[] neither employer." However, departing associates do not control the timing of the SSA's decision-making and, as noted above, M&N alleges that the wait for SSA fee authorizations can be lengthy. Hence, the efficacy of these proposed measures would, at best, be limited. The SSA's suggestion that M&N could assess its departing associates the amount of attorney's fees that are uncollectible because of their departures strikes us as both inappropriate and impractical. In short, the SSA unreasonably attempts to place the burden of its unsupportable practice on the associate attorneys and their firms.

representation to individuals.[31]  It credited the SSA's explanation that "its regulatory scheme of recognizing individuals rather than law firms is to enable the SSA to 'ensure quality, protect the rights of claimants, and ensure that claimants have the information they need to make sound decisions with respect to their benefits.'" M&N II, 444 F. Supp. 3d at 327 (quoting Defs.' Cross-Mot. for Summ. J. 37, No. 1:17-cv-00317-JJM-LDA, ECF No. 45 (filed May 30, 2019)).

The question before us, however, is not the reasonableness of the limitation on who may represent claimants. Rather, assuming the rationality of that limitation, we are asked to decide whether the SSA's framework is nonetheless arbitrary in refusing to apply in its payment rules the practical reality -- which it recognizes for tax purposes -- that law firms ordinarily are the ultimate recipients of fees paid to salaried associates.  None of the reasons offered by the SSA for insisting on representation by individuals supports that inconsistency.  We fail to see, for example, how a fees payment made directly to law firms -- but linked to the representation provided by individual attorneys -- would conflict with the agency's choice to allow only individuals to serve as representatives.

---

[31] The district court's discussion of the rule's asserted arbitrariness was in the context of M&N's substantive due process claim because the court had dismissed the APA claim.  See M&N II, 444 F. Supp. 3d at 327-28.

- 48 -

The SSA maintains that its payment rules generally, and any distinctions in how the rules affect attorneys with varying employment circumstances, "have been based in practical realities," and reflect the agency's responsibility "to apply its 'good judgment'" in distributing the 25 percent of a claimant's past-due benefits that it may withhold for the direct payment of fees. Appellee's Br. at 29 (quoting Culbertson v. Berryhill, 139 S. Ct. 517, 523 (2019)). But the agency does not explain what "practical realities" justify an approach that demonstrably burdens the entities that supply the individual representatives. Indeed, a 2015 report prepared by the SSA's Office of the Inspector General stated that about 60 percent of the agency's direct representative fee payments in 2013 "related to affiliated firm income." Office of the Inspector General, Agency Payments to Claimant Representatives (A-05-15-15017), 4 (July 2015). The "practical realities" would thus seem to weigh toward easing the participation of an important source of support for SSA claimants.[32]

---

[32] The distinction between allowing entities to serve as representatives and allowing fees payments to law firms was recognized in a congressional response to a 2008 proposed rulemaking in which the SSA considered allowing entities to represent claimants. The statement, made by the chair of the House Subcommittee on Social Security on the committee's behalf, was quoted in the SSA's Cross-Motion for Summary Judgment in this case:

> While it may be more efficient in some cases
> to pay the fee directly to an entity that is

The intricacy of the SSA's framework for representation of claimants and attorney's fees cannot justify refusing to alleviate the payment barriers, which affect both attorneys who change firms and attorneys who move to government employment -- transitions that regularly occur. Indeed, because the specific payment procedures are set forth in the POMS and HALLEX manuals, see, e.g., POMS § GN 03910.042.A.3 (stating that, even when "representative[s] [are] associated with [an] entity," the SSA "pays fees directly only to individual representatives"); HALLEX § I-1-2-3.A (similar), the payment mechanics can be -- and have been -- revised internally and informally. See, e.g., supra note 11. Moreover, as described above, the SSA already has registration procedures in place to identify when a representative is associated with a law firm.

Neither § 406 nor the regulations promulgated under it prevent the SSA from making direct payments from past-due benefits in a way that ensures the compensation reaches the entities that

> the employer of a representative eligible for direct payment, actually authorizing that entity to act as an individual's representative would weaken the chain of accountability and create more problems than it would solve.

Defs.' Cross-Mot. for Summ. J. 34, No. 1:17-cv-00317-JJM-LDA, ECF No. 45 (filed May 30, 2019) (quoting Michael R. McNulty, Comment on Revisions to Rules on Representation of Parties, Docket No. SSA-2007-0068 (Nov. 6, 2008)) (emphasis omitted and added).

are, in fact, financing the representation of claimants. The agency's position that only "representatives" may be paid, and that representatives must be individuals, does not foreclose mechanisms in which the fees remitted to individual attorneys would reliably and efficiently reach the law firms at whose expense the compensated services were performed. Indeed, a firm's inability to access its associates' share of fees undermines the statutory objective to ensure "a reasonable fee" for the representation services provided to SSA claimants. 42 U.S.C. § 406(a)(1).[33]

It is not our role to determine what those mechanisms should be. However, we can see multiple ways of adjusting the current approach without disturbing the agency's judgment that only individuals should represent claimants. As noted above, the SSA already expects law firms to disclose an attorney-representative's association with a firm. In such cases, the associate-representative could advise the SSA that any fees

---

[33] To be clear, the problem is not only the refusal to pay fees at all -- in the context of associates moving to government employment -- but also the agency's arbitrary denial of payments from past-due benefits for work the agency knows was financed by a law firm. The latter occurs when, for example, an associate withdraws from an ongoing case being handled by his or her firm, moves to another law firm, and submits a petition for the representation services provided for a claimant at the behest (and expense) of the original firm. At present, fees for that withdrawn attorney's work may be obtained only from the claimant, see POMS § GN 03920.017.A -- a route that typically is unproductive, see supra note 10.

authorized from the claimant's past-due benefits are jointly payable to the firm. In other words, the SSA could simply honor the limited power of attorney that M&N and other firms require their associates to execute, in which the associates relinquish payments made to them for representing SSA claimants. This approach could not only avoid issues when associates move to government jobs, but it also could clear up the confusion when attorneys change firms. Payments could be steered to the law firms where the associates were employed when they performed the representation services. Alternatively, the SSA could treat the services performed by an associate representative as subsidiary to the work of a designated "main representative" and transmit all fees for the co-representation to the main representative.

In short, we conclude that the SSA's current approach, insisting on the administrative transfer of funds from past-due benefits exclusively to individuals, without regard for who bore the cost of the representation, is not supported by "any rational view of the record." Atieh, 797 F.3d at 138. That disregard frustrates, rather than advances, the statutory mandate to provide a reasonable fee for the representation of Social Security disability claimants.

Accordingly, having found arbitrary the rule disallowing direct fee payments to law firms on behalf of their associates, we hold that the SSA must revise its payment procedures consistent

with our discussion above. That is, going forward, the agency must provide a reasonably reliable means for law firms to obtain directly from claimants' past-due benefits the fees payments that, pursuant to existing SSA and federal tax rules, would be recognized as income to the firms. As explained infra, the SSA also must take appropriate action with respect to the specific fees that M&N seeks in its complaint.

**IV.**

We now briefly turn to M&N's challenges to the district court's rejection of its constitutional claims, which alleged violations of its rights to equal protection and substantive and procedural due process. As a remedy for each of these claims, M&N sought essentially the same three declaratory judgments: (1) the SSA's rules and regulations unconstitutionally deprive the firm of its property and are therefore unenforceable; (2) the SSA must disburse to M&N attorney's fees for the work of its associates when they leave the firm; and (3) the attorney's fees generated by Wilson, Dorsey, and Posey while they worked at M&N are the property of the firm.

We find it unnecessary and, indeed, inappropriate for us to reach these claims. Under the doctrine of constitutional avoidance, "federal courts are not to reach constitutional issues where alternative grounds for resolution are available." Vaquería Tres Monjitas, Inc. v. Pagan, 748 F.3d 21, 26 (1st Cir. 2014)

(quoting ACLU v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 52 (1st Cir. 2013)); see also Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 205 (2009) (stating that the Court ordinarily "will not decide a constitutional question if there is some other ground upon which to dispose of the case" (quoting Escambia Cty. v. McMillan, 466 U.S. 48, 51 (1984) (per curiam)). We are satisfied that the relief available under the APA adequately addresses M&N's remedial requests and that, hence, resolving the constitutional questions would be inconsistent with our obligation to avoid doing so where a non-constitutional disposition is possible.

We do offer, however, two observations concerning M&N's constitutional claims. First, with respect to equal protection, the record provides no basis for viewing any payment inconsistencies among law firms as other than bureaucratic errors. Second, with respect to the substantive due process claim, the Supreme Court has advised restraint in characterizing governmental action as "arbitrary in a constitutional sense." Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992); see also id. at 125 (noting the Court's "reluctan[ce] to expand the concept of substantive due process"); Cty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) ("[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense . . . .'" (quoting Collins, 503 U.S. at 129)). Hence, our assessment that

the SSA acted arbitrarily within the context of the APA would not necessarily lead to such a determination under the Constitution.

## V.

In sum, we conclude that the SSA's rule barring payments to attorneys for work completed before they enter government service is both arbitrary and, in some circumstances, in conflict with the statutory mandate to pay "a reasonable fee" for successful representation of SSA claimants.  42 U.S.C. § 406(a)(1).  Hence, that rule must be eliminated.  In addition, the SSA must adjust its rules, as described above, to ensure that the law firms that employ salaried associates to represent SSA claimants may receive direct payment of the attorney's fees to which the firms' associates are entitled for representation performed while employed by those law firms.  See id. § 406(a)(2), (4).

Consistent with these holdings, the SSA should release any fees currently held in escrow by M&N that would have been properly obtained by the firm if the required changes described above had been in effect when the payments were transmitted.  In addition, upon resubmission by M&N, the SSA must revisit fee requests that it denied for representation services that were completed by Wilson, Dorsey, and Posey before they began government employment and that were denied based on 18 U.S.C. §§ 203 and 205.

We further conclude that, given the availability of a remedy under the APA, M&N is not entitled to mandamus relief in

this case. Finally, because M&N has achieved under the APA substantially the remedy that it sought in this action, and to which it is entitled, we do not address its constitutional claims other than to vacate the grant of summary judgment for the SSA on those claims.

Given the intricacy of the SSA's fees framework, we recognize that our directives may leave uncertainty concerning some aspects of the required changes in the agency's rules or the implementation of the prescribed actions. Accordingly, we remand the case to the district court for resolution promptly of any such lingering questions, with appropriate input from both parties.

The judgment of the district court is therefore affirmed in part (Count IV: mandamus and Count IX: APA notice-and-comment) and vacated in part (Counts V, VI, VII: the constitutional claims and Count VIII: APA arbitrary-and-capricious). Judgment is granted for M&N on Count VIII, and the case is remanded for further proceedings, if needed. So ordered. Costs to appellant.